## P. G. NOEL v. C. F. DRAKE.

CONTRACT, *Against Public Policy*. N. entered into a verbal contract with D., a director and the president of a national bank, to buy of the latter one hundred and fourteen shares of stock in the bank, at $140 per share, upon the condition that he should be made cashier of the bank. Afterward D. notified N. that he could not and would not comply with the contract. Thereupon N. brought his action to recover damages for the breach thereof. *Held*, The consideration of the contract being against public policy, the contract is void, and N. is not entitled to recover damages.

*Error from Bourbon District Court.*

ACTION by *Noel* against *Drake*, commenced January 5, 1881. Among other matters the petition alleged that *Drake*

had been intimately acquainted with plaintiff and his business for a number of years prior to July 25, 1880, and knew approximately the business plaintiff was doing and the profit thereof, and the salary plaintiff was getting; that with the full knowledge of these facts, *Drake* for a period extending from thirty days prior to July 25, 1880, almost daily sought and importuned plaintiff to dispose of his interest in the "Boston store," then operated by him at Fort Scott, in partnership with one J. E. Westervelt, and to invest the capital which plaintiff had in the store, with his other capital, in the stock of the First National bank of Fort Scott, of which *Drake* was the president, and to take the position of cashier thereof; that as an inducement so to do, *Drake* stated and represented to plaintiff that a mill and elevator in the city of Fort Scott, then owned and operated by the bank, and of the value of $30,000, had made $30,000 of net profits in the last five years for the bank, or an average profit of $6,000 per annum; that the bank was in an exceedingly prosperous and money-making condition, and had made a net profit of over $13,000 in the year 1879; that the defendant controlled absolutely the majority of the board of directors of the bank, and that he would make plaintiff cashier thereof at an annual salary of $1,500; that the bank needed a man of plaintiff's business capacity for cashier; that C. H. Osbun, who was then acting as cashier, was only temporarily filling the place, and would resign such position on his request; that the defendant, together with one Martin, his nephew, would take charge of and operate the mill and elevator, while plaintiff should have full charge and control of the current business of the bank; that, relying upon the statements and representations of the defendant, and being induced thereto solely by the same, the defendant, on or about July 25, 1880, contracted and agreed with plaintiff to sell and deliver to him one hundred and fourteen shares of bank stock of the actual value of $150 per share at $140 per share, and of the aggregate value of $15,960, and to make him cashier with a salary of $1,500 per annum; that the payment to be made for the

stock and the position of cashier assumed by plaintiff was to be as soon as he could dispose of his interest in the "Boston store," which, as said defendant advised and directed, plaintiff disposed of without delay for the purpose of procuring the money to invest in the stock according to the agreement; that, relying solely upon the statements, representations and inducements of the defendant, and upon the agreement of the defendant, plaintiff, by the advice of defendant, on or about the first day of August, 1880, sold and disposed of all his right and interest as a partner in the "Boston store" for the sole and only purpose of paying for the stock according to the agreement and of assuming the position of cashier of the bank at the annual salary of $1,500 per annum; that immediately after the sale of his interest in the store, plaintiff went to defendant with the money and told him that he had come to pay him for the stock as agreed upon and to assume the position as cashier of the bank, and thereupon the defendant notified him that he and the bank had sold the mill and elevator, and that the defendant could not and would not comply with the contract, and wholly failed and refused to comply with the same. . . . That by the action of the defendant and through his sole fault, plaintiff was deprived of his salary, and profits of the "Boston store" from August 1, 1880, to January 1, 1881, as well as the value of his personal services and interest on his capital, as well as the difference in value between the price to be paid for the stock and the value thereof, being $10 per share or $1,500; to the damage of the plaintiff of $5,500 — for which plaintiff demanded judgment against defendant. Trial at the December Term of the court for 1881, and the case is brought here by the plaintiff to review the ruling of the trial court in sustaining a demurrer to the evidence of plaintiff, and rendering judgment for the defendant thereon.

*C. O. French*, for plaintiff in error.

*A. A. Harris*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: It appears from the testimony of Noel, the plaintiff, that after repeated interviews and conversations, on or about July 25, 1880, Drake, the defendant, agreed to sell Noel one hundred and fourteen shares of stock owned by him in the First National bank of Fort Scott, Kansas, at $140 per share, and to give Noel employment as cashier at the bank, at a salary of $1,500 per annum. This evidence supports the allegations of the petition. The trial court held as a matter of law that the contract was void for two reasons: *First,* that it was impossible of performance; and *second,* that it was against public policy.

In this case the last objection to the contract embraces the first, because, if the consideration was void on the grounds of public policy, we must declare the contract impossible of performance, and affirm the ruling of the district court in refusing to entertain any action for breach of the alleged contract against the promisor. Drake had not the legal authority, either as a director or as the president of the bank, to make an arrangement to remove the cashier of the bank without the consent of the board of directors, or enter into a contract for a sale of the cashiership; and the contract between Noel and Drake for such removal and sale must be held to be contrary to public policy. The purpose and effect of the contract were liable to influence Drake in the decision of a question affecting the private rights of others, by considerations foreign to those rights. The national bank act authorizes the board of directors of a bank to appoint a president, vice president, cashier and other officers, and permits the directors of a bank to dismiss such officers or any of them at pleasure, and appoint others to fill their places. (Sec. 513, U. S. Rev. Stat. 1873-4.) Each person appointed a director of a national bank is required to take an oath that he will, so far as the duty devolves upon him, diligently and honestly administer the affairs of the association, and will not knowingly violate, or willingly permit to be violated, any

of the provisions of the national bank act. (Sec. 5147, U. S. Rev. Stat.)

In the relation of trust and confidence which Drake occupied as a director and president of the bank, which required him to look only to the best interests of the bank and its stockholders, it was improper for him to be influenced by agreements with or considerations from a stranger to the association in the selection of a cashier, or in the discharge of any of his other official duties. The appointment of officers by the directors of a national bank ought not to be made a matter of bargain and sale between applicants and members of the board. (*Guernsey v. Cook,* 120 Mass. 501; *Noyes v. Marsh,* 123 Mass. 286; *Merchants' National Bank v. State Bank,* 10 Wall. 604–650; *Railroad Co. v. Ryan,* 11 Kas. 602; *Haas v. Fenlon,* 8 Kas. 601; *Tool Co. v. Norris,* 2 Wall. 45.)

The ruling and judgment of the district court will be affirmed.

All the Justices concurring.