# JAMES R. GAGE *vs.* ASA FISHER.

Opinion filed November 11th, 1895.

**Specific Performance—Contract to Control Stock of Another, at Stockholders Meeting.**

> Equity will not specifically enforce a contract to give a minority stockholder the right to control the stock of another and vote it at a stockholders' meeting, where the sole purpose is to secure control of the corporation by the use of such stock.

**Contract Contrary to Public Policy—Rescission.**

> Therefore, when such a contract has been made, and on the strength of it the promisee has suffered to pass beyond his control stock which, in connection with stock owned by him, would have given him control of the corporation, and thereafter the promisor threatens to sell his stock to the opposing faction, and thus give them control of the corporation, and the promisee, to save himself from defeat in his project to secure control of the corporation, purchases such stock at a figure much in excess of its normal market value, such contract of purchase cannot thereafter be rescinded, but the purchaser must pay the stipulated price.

**Illegal Consideration.**

> A contract to allow another to control the voting of stock, based upon a promise of the one who is to control such stock to secure for the owner of the stock an office in the corporation, is illegal; and the whole contract is void, although the illegal consideration (*i. e.* the promise to secure for the owner of the stock a corporate office) constitutes only a part of the consideration for the agreement to give such promisee control of the stock.

Appeal from District Court, Burleigh County; *Winchester*, J.

Action by J. R. Gage against Asa Fisher. Judgment for defendant, and plaintiff appeals.

Reversed.

*G. W. Newton* and *S. L. Glaspell*, for appellant.
*Alexander Hughes*, for respondent.

CORLISS, J. We have reached the conclusion in this case that we must decide against the defendant and respondent, on his own theory. Taking the view of the facts which is most favorable to him, we are yet compelled to hold that he has neither any defense to the note sued on, nor any valid counterclaim against the plain-

tiff for money paid by him to plaintiff in part payment of such note. We will state our reasons for this conclusion as briefly as the complicated nature of the case will permit.

The action is on a promissory note for $3,000 given by defendant to plaintiff. The consideration for the note was the sale by plaintiff to defendant of 10 shares of the stock of the First National Bank of Bismarck, N. D. The date of this transaction was December 19, 1893. The capital stock of the bank was $100,000, divided into 1,000 shares of $100 each. For some time prior to 1888, plaintiff and defendant had both been directors of this bank, and defendant had been president thereof. In 1888 plaintiff was dropped from the directory, and in 1889 the defendant also ceased to be a director. The control of the bank was then in the hands of a number of stockholders, who acted in unison, and who were more or less hostile to defendant and plaintiff. Among these stockholders were George H. Fairchild, H. R. Porter, and Daniel Eisenberg. This group of stockholders will be designated in the course of this opinion as the "Fairchild interest." The defendant, for the purpose of securing control of the bank, began purchasing its stock, and in the summer af 1892 he found himself the owner of 489 shares of such stock, and in the possession of a proxy to vote 16 shares more, owned by a Mrs. Shaw. Had this condition of affairs remained unchanged until the next annual stockholders' meeting, in January, 1893, the defendant would have been master of the situation, and would have secured full control of the bank, electing his own board of directors, and, through them, such officers of the corporation as he might see fit to elect. While this condition existed, the defendant claims that he was induced to part with his control over the Shaw stock at the suggestion of plaintiff, and under his promise to allow him (the defendant) to control, or in other words to direct, the voting of this stock at the next annual stockholders' meeting, in January, 1893. Relying on this promise of the plaintiff to defendant, who, unquestionably, could have voted the Shaw stock at such meeting, had he so desired, defendant notified Mrs. Shaw that she

could sell this stock to the Fairchild interest. The plaintiff, the defendant, and Mrs. Shaw were all hostile to the Fairchild interest; and the motive which prompted defendant in releasing his control over the Shaw stock, and in suggesting to Mrs. Shaw that she sell it to the enemy, was apparently a desire to induce the Fairchild interest to assume the heaviest possible burden, without at the same time giving them control of the majority of the stock. Defendant, having purchased 2 more shares, was now the owner of 491 shares; and, when plaintiff promised him control of his 10 shares, defendant felt sure of a majority, and therefore permitted the control of the Shaw stock to pass from him. Plaintiff now held the balance of power. The Fairchild interest began to bid for his stock. Finding that plaintiff, despite his promise to allow defendant to control his stock at the meeting, intended to sell to the enemy unless he (the defendant) purchased it for the sum of $5,000, he finally yielded to this demand, and the contract of sale was entered into on this basis. It is not claimed, however, that plaintiff, from the start, intended to inveigle by his promises the defendant into a position where he could take advantage of the necessities of his situation to extort from him an exorbitant price for the stock. Fraud is not claimed, except as as it is urged that plaintiff's subsequent conduct was fraudulent in contemplation of law. Two thousand dollars of the purchase price was paid at the time of the sale, and the note in suit, for $3,000, was given for the balance of the consideration. Subsequently the defendant paid $1,000 on this note, and thereafter this suit was brought to recover the remaining $2,000 due thereon, with interest. The defendant interposed as a counterclaim a claim to recover back the $3,000 so paid; having, as he insists, rescinded the contract, and offered to restore to plaintiff the 10 shares of stock delivered under it. The trial court rendered judgment in his favor, both on the plaintiffs's claim against him, and on his claim against the plaintiff; directing that the note be canceled, and that defendant recover from plaintiff the consideration paid, namely, $3,000. It is true that the plaintiff

claims and he so testified that the agreement between him and the defendant was that he would give defendant the preference in purchasing the stock, in case he offered as much for it as the Fairchild interest; and, if this be the case, he was acting strictly under the contract, in demanding the sum of $5,000 for his stock from the defendant. In that event, both law and good morals would approve the course. But the trial court found that the contract was as we have stated, and we will assume, for the purpose of this decision, that this finding is correct. The defendant certainly cannot, and he does not, claim that he proved a case more favorable to himself than the findings, nor does he pretend that he can ever establish a stronger case on another trial. ·

Taking these findings as the basis of our decision, we are very clear that the court erred in deciding the case in favor of the defendant. The court erred in its conclusions of law that the facts found established a defense to the note, and also a valid counterclaim for the $3,000 paid on account of the purchase price. We regard the contract for the sale of the 10 shares of stock for $5,000 as entirely legal, and we do not consider that the defendant is in position legally to claim that, because an unconscionable price was extorted from him on account of the necessities of the situation, he has any right, after having, with full knowledge of the facts, submitted to the demand, to rescind the contract he deliberately made. · If it is true (but we express no opinion on this question of fact) that the plaintiff, after having induced the defendant to part with the control of the corporation, by letting the Shaw stock slip from him on promise to substitute his (plaintiff's) stock for the Shaw stock, and to allow defendant to use the plaintiff's stock as he (the defendant) could have used the Shaw stock at the next annual meeting, his subsequent conduct in repudiating his agreement was an act of gross perfidy, and the using of his power, under such circumstances, to coerce the defendant into paying an exhorbitant price for this stock, which was worth in the general market not over $500, was base and dishonorable in the extreme. But the decision of this case turns

on a larger question,—the question of public policy. There is no pretense that plaintiff was guilty of any fraud in the sale of the stock. The parties both dealt at arm's length. There was no concealment of any fact. There was no misreprentation. Whatever relation of confidence which theretofore existed between the plaintiff and defendant must have ceased, whatever esteem which the defendant had entertained for the plaintiff must have instantly perished, when he was confronted by the plaintiff with this, to the defendant, unconscionable demand that he pay him $5,000 for stock which, as defendant understood, the plaintiff had agreed he was to have the right to use at the meeting without compensation. Whatever defendant did at this time must have been done, not cheerfully, in a spirit of confidence, but reluctantly, with anger in his heart, and therefore with no disposition on his part to yield to any demand, except so far as coerced by the necessities of his position.

It is said that plaintiff having, by his promises, induced the defendant to place himself in the plaintiff's power, the plaintiff should not be allowed to take advantage of the situation to extort from him an exorbitant price for the stock. The fallacy of this reasoning lies in its untenable assumption that defendant, at the time he bought the stock for $5,000, under the stress of necessity, could have maintained an action against plaintiff to compel the specific performance by him of his contract to allow defendant to vote his (the plaintiff's) stock. If, at the time defendant agreed to pay $5,000 for this property, he was powerless to secure redress in a ccurt of equity,—if at that time the plaintiff could not be compelled to permit him (the defendant) to vote the stock,—then plaintiff had a perfect legal right to sell to whom he pleased, for such price as he could obtain, and therefore had an undoubted legal right to sell to defendant for $5,000, so long as defendant, being under no other pressure than that of his necessities, agreed to pay that sum for it. Defendant has no right to insist that he was unexpectedly placed in this peculiar position, relying on the promise of plaintiff; for, if it was a

promise which a court of equity would not enforce, he had no right to rely on such promise. He was bound to know that the plaintiff might refuse to carry out his agreement, and that in that event he (the defendant) would be powerless to compel its performance, but must, to save himself from being baffled in his scheme, buy the stock at such a figure as it could be purchased for. Even assuming the contract to allow defendant to control the stock to be valid; so that its breach would subject plaintiff to liability for damages, still defendant cannot use the breach of that promise as a basis for rearing upon it this argument that plaintiff took advantage of his necessities, unless such contract could be specifically enforced in equity. Plaintiff had a legal right to take advantage of his necessities, and exact such price as he could under the circumstances secure, if he could not be compelled by a court of equity to allow defendant to vote the stock. If plaintiff could break this promise without liability for damages, because it was void, he could charge what he chose for the stock, and defendant would have no legal ground for complaint. So if the breach of this promise, assuming it to be valid, subjected him to liability only for damages, he yet could break it, and compel the defendant to buy the stock and pay him what he asked for it, without rendering himself liable to the charge of having, in legal contemplation, extorted an unconscionable contract from the defendant. Suppose that the contract was valid, and that its breach would have subjected the plaintiff to liability for $500 damages. He might have broken it, and then have taken the position that, while he was liable for these damages, he yet had the undoubted legal right to break such contract and incur such liability, and thereupon sell the stock to whom he pleased, without being liable for anything more; and, if the defendant desired to purchase on the same terms as another person had offered, he had a legal right to make a new contract of sale with him (the defendant), and the contract would be as valid as a sale to a stranger. The defendant could not complain that an unfair advantage had been taken of him, for, if it is the

law that a court of equity will not enforce such an agreement as the original one in this case, but will leave the party to his action for damages, then defendant was bound to know that he was all the time at the mercy of the plaintiff, who might at any moment repudiate the contract, without other liability than for damages; and the defendant was in this position because he had failed to take the precaution to secure a promise that would fully protect him. He has no legal right to appeal to equity for relief because the plaintiff took advantage of this struggle for supremacy to exact from him (defendant) an enormous price for his stock, if he (the defendant) failed to secure from plaintiff such a contract to protect him against such exaction as a court of equity would enforce for his protection. Before this promise to allow the defendant to vote the stock was made, plaintiff might have sold his stock to defendant for $5,000 without the possibility of any rescission of the contract. If defendant saw fit to let the Shaw stock go, without securing in place of it an agreement that he could enforce in equity against the plaintiff, and without securing the plaintiff's stock itself, he voluntarily relinquished his vantage ground without taking the precaution to protect himself legally, and trusted himself and his interests to the honor of the plaintiff; knowing full well, as he testifies himself, that the plaintiff, in the impending struggle for supremacy, would be sorely tempted to desert him, and, being only human, might fall.

If we should affirm this judgment, we would give the defendant all the benefit he could have obtained from a decree of specific performance, rendered before the stockholders' meeting, that defendant be allowed to vote the stock. Defendant would recover his money; plaintiff would have back his stock; and it is undisputed that defendant has in fact voted the stock in the manner he desired to vote, and has, through the use of this stock, secured control of the corporation. We are satisfied that, both on principle and under sound authority, the true rule is that a court of equity should never specifically enforce a contract by which one person agrees that another should control his stock

without purchasing it, where the sole ground of the appeal to equity is the desire of the party making the appeal to secure control of a corporation through the use of the stock he is thus seeking to control. It is a general rule that a court of equity will not enforce a specific performance of a contract for the sale of personal property. Corporate stock comes within the scope of this rule, unless there are peculiar features calling for the interposition of a court of equity. But, when such peculiar features exist, equity will decree specific performance. *Eckstein* v. *Downing,* (N. H.) 9 Atl. 626; Appeal of *Goodwin Gas-Stove & Meter Co.* (Pa. Sup.) 12 Atl. 736; Cook, Stock, Stockh. & Corp. Law, § § 737, 738; *White* v. *Schuyler,* 1 Abb. Prac. (N. S.) 300; *Treasurer* v. *Mining Co.,* 23 Cal. 390; *True* v. *Houghton,* 6 Colo. 318; *Bumgardner* v. *Leavitt,* (W. Va.) 13 S. E. 67. When the only peculiar feature is the desire of the plaintiff, with the aid of the stock he is seeking to obtain, to secure the control of a corporation, this, perhaps, so far from being a ground for taking the case out of the ordinary rule, may be a reason for denying the relief sought. While it is not illegal for a stockholder to buy up a controlling interest in a corporation, and so absolutely rule its affairs, and while it is also true that agreements to vote stock together are not, when carried out, illegal, in the sense that the law regards the vote as void or voidable, yet it may be contrary to public policy for a court of equity to decree specific performance of contracts touching the control of stock, where the sole object of the person who is seeking to enforce the contract is thereby to secure control of the corporation. We do not say that such a contract is necessarily void, as repugnant to public policy, but we are by no means clear that a court of equity would specifically enforce it. It may be that sound public policy demands that a court of equity should never lend its aid to the enforcement of a contract relating to stock, when the sole object of the person who wishes it enforced is to give that person control of the corporate affairs. Efforts are often put forth to secure the management of a corporation, which are inspired by laudable motives. But it is

also true that many of these schemes to obtain the control of a corporation are conceived and carried on in a spirit inimical to the interests of the minority stockholders, and not infrequently for the purpose of so managing the affairs of the corporation as to force them to sell their holdings at practically such a figure as the majority stockholders should dictate. Should courts of equity adopt the practice of giving to a minority stockholder the right to enforce specific performance of a contract to buy stock, simply to enable him to control the corporation, or, what is still more indefensible, the right to vote or control the voting of stock that he does not own, to enable him to secure control of the corporation, they would find that in many cases they had suffered their functions to be perverted by designing men; that they had in fact been lending to dishonorable schemes such effectual aid as to insure their consummation. Proof that the object was legitimate, that the motive was pure, would furnish no guaranty that the real purpose was not to wreck or mismanage the corporate affairs. In no case can a court determine with certainty just what course the minority stockholder, when armed by the court with this absolute power over the corporation, will pursue when he has attained his vantage ground. It is therefore possible that the question whether specific performance should be decreed ought not to turn on the court's surmise or guess as to the ulterior purpose of the person who is seeking to secure control; but because there is always danger that such purpose may be dishonest, and because the court can never surely know the truth as to the real motive, it may be that courts of equity should inflexibly refuse to aid the minority stockholder in his effort to obtain control. In this case the defendant's motive appears to have been honorable, and we have no doubt that such is the fact. He was merely seeking to take the management of the bank from persons who, in his judgment, were mismanaging it, and resume control of its affairs, that it might be built up for the benefit, necessarily, of all stockholders. But perhaps this fact should

N. D. R.—20

not influence us.   If the specific enforcement of·such a contract is to turn on the opinion of the court touching motives, it is obvious that in many cases dishonest projects will receive effectual equitable aid.   The decision of the Pennsylvania Supreme Court in Foll's Appeal, 91 Pa. St. 434, strongly supports the view that equity would not specifically enforce a contract for the sale of stock where the only ground for invoking the aid of the court is the peculiar value of the stock to the person who has contracted to buy it, because of his desire to secure control of the corporation.   The bill in that case was filed to compel specific performance of a contract to purchase stock in a national bank. The basis of the application to equity was the desire of the plaintiff to secure control of the bank.   The court unanimously held that, on grounds of public policy, the relief should be denied. The court said:   "While the legal right of the complainant to buy up sufficient of the stock of this bank to control it in the interest of himself and friends may be conceded, it is by no means clear that a court of equity will lend its aid to help him.   A national bank is a *quasi* public institution.   While it is the property of the stockholders, and its profits inure to their benefit, it was never-theless intended by the law creating it that it should be for the public accommodation.   It furnishes a place, supposed to be safe, in which the general public may deposit their moneys, and where they can obtain temporary loans upon giving the proper security. There are three classes of persons to be protected,—the deposi-tors, the noteholders, and the stockholders.   We have no intima-tion that the bank, as at present organized, is not prudently and carefully managed.   The stock, as now held, is scattered among a variety of people, and held in greater or lesser amounts.   It is difficult to see how the small stockholders, who have their modest earnings invested in it, the depositors, who use it for the safe-keeping of their moneys, or the business public, who look to it for accommodation in the way of loans, are to be benefited by the concentration of a majority of its stock in the hands of one man, or in such way that one man and his friends shall control it.

\* \* \* We are in no doubt as to our duty in the premises. We are of opinion that the end sought to be attained by this bill is against public policy, and for that reason we refuse our aid."

It is true that some stress was laid by the court on the fact that the plaintiff was operating with borrowed capital, in his efforts to secure control of the bank. But this fact was not treated as decisive, and it is clear from the whole trend of the opinion that the absence of this fact would not have resulted in a different ruling in the case. Moreover, this fact was adverted to as tending to show that the object was to speculate, and not to invest funds in corporate stock. But in the case at bar the defendant never intended to invest a dollar in plaintiff's stock until he was compelled to do it to enable him to accomplish his real purpose, which was to secure control of the bank. In *Moses v. Scott*, (Ala.) 4 South. 742, after stating that a vote based upon a prior agreement to vote as a unit would not necessarily be illegal, the court say, at page 744: "Whether an agreement to vote as a unit, or as an agreed majority may dictate, for any given length of time, is a contract so binding in its terms that no party to it can withdraw from it or disregard it without the consent of his fellows, may be a different question. Possibly public policy may exert an influence in the solution of this problem. And even if such a contract be lawful, and on its face exert a continuing force, the grave question comes up, will a court of chancery, in its enlightened discretion lend its aid to the enforcement of a contract of so doubtful policy?" However, we are not called upon to settle this interesting question in this case. The case before us presents a stronger one against the exercise of the equitable powers of the courts to enforce specific performance than a contract for the purchase of stock; for here the contract was to give the minority stockholder the right to dominate and direct the judgment of the plaintiff, as stockholder, in the voting of his stock, without owning the stock himself. Every other stockholder in the bank had the right to demand that the plaintiff should, if he desired so to do, exercise at the very time of the

annual meeting his own judgment as to the best interests of all
the stockholders, untrammeled by dictation, and unfettered by
the obligation of any contract. We know of no case where a
court of equity has enforced such an agreement. We regard as
controlling on this question the rule that an irrevocable proxy to
vote stock is revocable. See Cook, Stock, Stockh. & Corp. Law,
§ 610, note 6.

There is another reason, and to our mind a still stronger reason,
for holding that defendant could not have secured in a court of
equity a decree specifically enforcing this contract. The plain-
tiff's promise to allow the defendant to control his stock was
based upon an illegal consideration,—one condemned by public
policy,—and the promise was therefore not binding in law. The
trial court found that before defendant suffered the Shaw stock
to pass beyond his control, and before plaintiff had agreed to
permit defendant to control his stock, defendant had informed
the plaintiff that it was his purpose to vote his own and the Shaw
stock to make plaintiff one of the directors of the bank, and that
it was also his purpose to cause him (plaintiff) to secure employ-
ment in the bank when the new board of directors was elected;
that he desired the advice and co-operation of plaintiff in secur-
ing such control, and the selection of suitable persons to put in
the directory to carry out his plans, etc. The court also found
that thereafter plaintiff represented to defendant that he did not
need the Shaw stock "to accomplish his said purpose," that he
had better let the Fairchild interest purchase that stock, and that
he (the plaintiff) would not permit his stock to be bought or
controlled by the Fairchild interest, but that he would vote his
stock with the defendant's stock at the next annual stockholders'
meeting, for the persons agreed upon by plaintiff and defendant
for directors, and would in every way aid and assist defendant in
the consummation of his plans for securing the possession,
control, and management of the bank and its affairs. These
findings make it apparent that one of the considerations, if not
the main consideration, which influenced plaintiff in agreeing to

give defendant control of his stock, was the previous statement of defendant that he intended to make plaintiff a director, and see that he was employed in the bank by the new board of directors to be elected at the approaching stockholders' meeting. That both parties understood that at least a portion of the consideration for plaintiff's co-operation with defendant in the project to obtain control of the corporation was the promise of defendant to give him employment in the bank is apparent from a written contract subsequently entered into between the parties. On the 19th of December, but entirely separate from the contract of sale, the defendant signed and delivered to plaintiff, who accepted the same, the following memorandum of agreement: "Bismarck, N. D., Dec. 19, 1892. In consideration of J. R. Gage joining me in effecting the controlling interest of the capital stock of the First National Bank of Bismarck, I hereby agree to furnish said J. R. Gage, a position as cashier of said bank at a salary of not less than $100 per month, payable monthly, beginning at the 11th day of January, 1893, and during his ability to perform his duties as cashier, provided such control is assumed at such time. Asa Fisher." In connection with this agreement the court made a finding of fact which conclusively shows that, all along, one of the inducements to plaintiff's promise to vote his stock with defendant's stock was the promise of the latter to give him a place in the bank. "That said agreement was signed by the defendant, Fisher, and was then and there, on said 19th day of December, 1892, delivered to plaintiff, J. R. Gage, by the defendant, and was then and there accepted and retained by said plaintiff, and he, the said plaintiff, then and there promised to perform said agreement on his part; that said contract, interpreted and explained by the circumstances under which it was made and the subject to which it relates, was intended by each of the parties thereto as follows: That the plaintiff would vote his said ten shares of stock at the annual meeting of the stockholders of said bank, to occur in the month of January following, for the persons agreed upon by the plaintiff and defendant for the directors of

said bank, and that he would aid, assist, and co-operate with the defendant in carrying out the plans which they had previously discussed and agreed upon for the management of said corporation, as hereinbefore set forth, and that the defendant would use his influence with the said persons proposed and agreed upon for directors, when chosen, to elect the plaintiff to the position of cashier of said bank, at a salary of not less than $100 per month, during his ability to perform said duties."

It is apparent from the findings that this written agreement represents the previous oral understanding between the parties, reduced to writing. It is not claimed that the parties entered into three different contracts. There were only two agreements made. One related to the control of the stock by defendant without buying it. The other was the contract of sale. The court expressly finds that this written contract was no part of the contract for the sale of the stock. That one of the considerations which induced plaintiff to enter into an agreement to vote his stock with defendant's stock was the defendant's promise to secure his employment in the bank, is apparent from the findings to which we have referred; and as it is not pretended, and does not appear, that two different contracts relating to the control of plaintiff's stock by defendant preceded the contract of sale, we can find no escape from the conclusion that the promise on which defendant relied in parting with the Shaw stock was a promise made by plaintiff under the expectation, justified by defendant's promise, that he (plaintiff) was to have a place on the board of directors, and also a position in the bank, at a salary. We are strengthened in this view by the consideration that, unless the promise to give plaintiff employment was part of the original arrangement, the subsequent written promise of defendant would be without consideration. If plaintiff, for a sufficient consideration, had already promised to let defendant control his stock, an agreement on the part of defendant to give him an additional consideration for the right which was already his would be a purely gratuitous promise, not binding in law. So far from its

appearing that defendant regarded that he was making such a promise, he shows by the written agreement signed by him that the sole consideration running to plaintiff for his agreement to permit defendant to control his stock was defendant's promise to secure him a position as cashier in the bank. It is impossible to conceive that so shrewd a man as the defendant would have promised in writing to give plaintiff a postion in the bank, if such had not been part of the original understanding; for, unless it was part of it, the defendant had already secured, by his contract with plaintiff, all he could ever obtain by making additional promises. The case would be similar to that of a person, after having secured a contract for the sale to him of stock for a specified consideration, promising in writing that in consideration of such sale he would give the owner of the stock a place in the corporation. Such a promise would not be made by a reasonable being under such circumstances. The fact that such a contract was made in this case is convincing to our minds that the real consideration running to plaintiff for his original promise to let defendant control the stock was the promise of defendant to give him employment in the bank. This was what induced plaintiff to make the promise. At least, we are satisfied that it was one of the inducements. The contract was therefore contrary to public policy and void. At least a portion of the consideration was illegal, and hence the promise founded on it was a promise which no court would enforce. The law in such a case leaves both parties where it finds them. To neither will it give redress. That a contract relating to the purchase or control of corporate stock, founded in whole or in part upon a promise to secure for the person who owns the stock employment in the corporation, and an office therein, is illegal and void, is a doctrine supported by the unanimous voice of the decisions. *Woodruff* v. *Wentworth*, 133 Mass. 309; *Noel* v. *Drake*, 28 Kan. 265; *Guernsey* v. *Cook*, 120 Mass. 501; *Forbes* v. *McDonald*, 54 Cal. 98; *Cone's Ex'rs* v. *Russell*, (N. J. Ch.) 21 Atl. 847; *West* v. *Camden*, 135 U. S. 507, 10 Sup. Ct. 838. In the case last cited the court, referring to a contract,

one element of which was a promise to give one of the parties to it permanent employment as manager of a corporation in which he was a stockholder, said: "It was a contract, the purpose and effect of which was to influence the defendant, as a stockholder and officer of the company, 'in the decision of a question affecting the private rights of others, by considerations foreign to those rights, and the defendant, by the contract, was placed under direct and very powerful 'inducement to disregard his duties to other members of the corporation, who had a right to demand his disinterested action in the selection of suitable officers.' He was to be in a relation of trust and confidence, which would require him to look only to the best interests of the whole uninfluenced by private contracts. We think this salutary rule is applicable in this case, notwithstanding the alleged contract was not corruptly made for private gain on the part of the defendant. There were other stockholders in the company. The defendant and the Standard Oil Company, for whose benefit it is alleged the contract was made, were not all the stockholders; and it seems to us that it was certainly the right of those other stockholders to have the defendant's judgment, as an officer of the company, exercised with a sole regard to the interests of the company." It cannot be claimed that the illegal parts of this contract could have been separated from the remainder, and the agreement sustained to that extent. The case falls within no exception to the general rule that where a part of a contract is illegal the whole agreement is void. It was not a case where the contract had been executed on one side, and the person who had received the benefit of it was asked to pay only the legal consideration he had agreed to pay, the illegal consideration being waived. In such a case the agreement can be sustained to the extent of the legal consideration. *Casady* v. *Woodbury County*, 13 Iowa, 113; 1 Pars. Cont. 380. So far as any consideration ran to plaintiff, there was only a single consideration to induce him to make his promise to allow defendant to vote his stock, *i. e.* the promise to give him employment in the bank. But even if he had been induced to make this

promise for money, in addition to the agreement to give him a position in the bank, still the legal part of the consideration could not have been separated from the illegal, for no court could say, in the light of the actual contract, that he would have made the promise to allow his stock to be voted by another solely for the cash consideration. To separate the legal from the illegal consideration, under such circumstances, and then sustain and enforce the contract as so radically altered, wouldbe to make a new contract for one wrongdoer, to enable him to enforce against the other wrongdoer, who would be no more culpable, an agreement which he never made. See Greenh. Pub. Pol. p. 17, rule 21, and page 24, rule 25, and cases cited; 2 Add. Cont. pt. 2, bottom .paging, 762, and cases in note 1; *Tobey* v. *Robinson*, 99 Ill. 222-233; Comp. Laws, § 3533. For both of the reasons set forth in this opinion, we are clear that, at the time plaintiff and defendant made the contract of sale sought to be rescinded by defendant, the latter was powerless to compel the plaintiff to carry out his promise to allow defendant to vote his stock, and that, therefore, as defendant, to secure control of the bank, saw fit to buy the plaintiff's stock for the sum of $5,000, he could not, after availing himself of all of the advantages growing out of the possession of such stock, rescind the sale, on the theory that he was coerced by his necessities into making a hard bargain.

The confidential relations existing between the plaintiff and defendant would not transmute into a contract binding in equity a contract which otherwise would not be enforced by a court of equity. Equity will not grant or withhold relief because the promisor was or was not trusted by the promisee, but it will withhold relief, in all cases of this character, irrespective of the question of confidential relations, because public policy demands that equitable aid should not be extended to what is in fact an illegal scheme. Nor is there any force in the contention that the case is brought within the scope of the doctrine that a court will relieve a party who has made a contract under the stress of great necessity. As we have already demonstrated, the

defendant has only himself to blame for trusting to a promise the fulfillment of which equity would not compel. He was in no different position from that which he would have occupied had the promise of plaintiff never been made. And it is too clear to justify argument that had plaintiff demanded $5,000 for this stock, without having made any prior promise to permit defendant to control it, the defendant, if he saw fit to yield to this demand, would have been entitled to no relief on the ground that it was a hard bargain, extorted from him by the necessities of his situation. It would be a novel and dangerous doctrine that a party who, in his anxiety to secure property, had paid more than its market value, could appeal to equity to relieve him, because he had been impelled by his desires to pay a large price for the thing bought. The cases cited by counsel for defendant do not lay down any such doctrine. They are cases where one person has taken advantage of the financial distress of another to extort from him an unconscionable contract. See *Hough's Adm'rs* v. *Hunt*, 15 Am. Dec. 569, and note. Neither can it be said that the defendant was compelled to pay more for the stock than the market price. The strife of the controlling factions to secure control of the majority of the stock, to be used at the approaching stockholders' meeting, had temporarily given to this stock a value above its intrinsic value. To the purchaser of it, it meant victory and supremacy in the management of corporate affairs. Why should defendant claim that an exorbitant price had been extorted from him, if he was paying only what plaintiff could have secured from the opposing faction, had defendant declined to buy at that figure? The counsel for the defendant, in his learned and exhaustive brief, and in his very able oral argument before the court, has presented everything that could possibly be urged in favor of the case he represents; and this, too, with great ingenuity and force. But while we fully agree with him that, if the facts found be true, his client has a just grievance in the forum of conscience, yet we are unable, because of the considerations of public policy to which we have alluded, to give him any legal redress.

The judgment of the District Court is in all things reversed, and that court is directed to modify its conclusions of law in accordance with this opinion, and to enter judgment for the plaintiff for the full amount due on the note, for principal and interest. All concur.