ST. REGIS CANDIES, INC. ET AL. v. H. N. HOVAS.

No. 4880.   Decided February 29, 1928.
(3 S. W., 2d Series, 429).

*Baker, Botts, Parker & Garwood* and *Boyles, Brown & Scott,* for appellants. That the power to issue non-voting stock exists has been settled by a long line of decisions and legal authorities. Fletcher, Cyclopedia Corporations, Vol. 6, pp. 6035 to 6037, states the rule and collates most of the American English decisions. Thompson (3d Ed.), Vol. 2, p. 320, Sec. 949, also summarizes the consensus of opinion.

The text of these able authorities finds ample support in the following cases and authorities quoted in the brief of appellants, filed in the Court of Civil Appeals: Art. 1538a to 1538m (being Chap. 19a), R. S., 1925; Thompson on Corporations (2d Ed.), Vol. 1, p. 1051; Fletcher on Corporations, Vol. 6, pp. 6035–6037; Machen on Corporations, Vol. 1, Sec. 120; 14 Corpus Juris, 901, Sec. 1388; Reagan Round Bale Co. v. Heuermann, 149 S. W., 228; Langlen v. Goodman, 27 S. W., 841; Storrow v. Texas Construction, etc., Association, 87 Fed., 821; State v. Swanger (Mo.), 89 S. W., 872; Allen v. Montana Refining Co., 227 Pac., 582; People v. Koenig, 118 N. Y. S., 136; Millspaugh v. Cassidy, 181 N. Y. S., 276; Kent v. Quicksilver Mining Co., 75 N. Y., 159; Wilson v. Parson, 119 Fed., 653; Hamilton v. Railway Co., 78 Fed., 664; Miller v. Ratterman, 47 Ohio St., 141; Commonwealth v. Detwiller, 131 Pa. St., 614, 635, 639; General Investment Co. v. Bethlehem Steel Co., 100 Atl., 347.

The general corporation statutes are silent on the question of the right to vote which may be conferred by the ownership of stock. The banking statute (Art. 503) expressly provides that each shareholder of a banking corporation shall be entitled to one vote on each share of stock held by him. The railroad statutes expressly provide for the voting on each share of the stock of a railroad corporation in the election of directors and in making the by-laws. Art. 6289 and Art. 6293. Evidently the Legislature considered that the public had an interest in the management of these corporations because of their quasi-public nature, which did not attach to a purely private corporation.

It is plain that since Arts. 1323, 1326 and 1333 do not expressly forbid the exercise of the immemorial right to make contracts re-

specting the privilege of voting stock, and since they are not inconsistent with that right, they cannot be held to change the rule which permitted the exercise of that right.

Three other provisions of the statutes which contemplate voting by stockholders are: Art. 1330, providing for increase in capital stock; Art. 1332, providing for decrease in capital stock, and Art. 1387, Sec. 3, providing how a corporation may be dissolved. None of these articles expressly forbid the denial to holders of certain classes of stock of the right to vote; and in this respect are similar to the articles already discussed; but from these last mentioned articles they differ in purpose and effect and require a different treatment.

It will be noted that each of these three articles of the statute deal with matters of fundamental importance to the corporation. The question of the amount of its capital stock—the increase or decrease thereof—is one of vital and fundamental interest; for on such amount depends the ratio of dividends to investment; and nothing is more important to the corporation than the question of its dissolution —its life or death. These statutes, then, deal with fundamental changes in the corporation.

The legislative attitude on the question of public policy is shown in various ways. First, the Legislature failed to put into the general corporation laws any provision expressly condemning such a contract as is involved here, while it did put into the banking and railroad corporation laws provisions entitling the stockholder to vote on each share of stock owned by him. Under the principle of interpretation that the mention of one thing implies the exclusion of another thing, the Legislature evidently intended in this way to show its approval of the old established rule permitting stockholders to make contracts concerning the right to vote.

But we do not have to rely upon these negative Acts of the Legislature. In 1925, prior to the incorporation of St. Regis Candies, Inc., the Legislature passed what is known as the non-par statute. Arts. 1538a to 1538m Rev. Stats., 1925. This is statutory confirmation of a well established rule, but it is more. It is an express declaration of public policy. It settles beyond question the public policy of the State on the point at issue here.

*Allen B. Hannay* and *Fulbright, Crooker & Freeman,* for appellee. The only contract between the parties and referred to in the case is the charter of the corporation and the by-laws adopted by the stockholders for the government of same. Therefore the question immediately resolves itself to whether or not the unusual and revolu-

tionary provisions of the charter and by-laws of St. Regis Candies, Inc., denying a portion of the common stock the right to vote and placing the absolute control of the corporation in the hands of a person holding 51 per cent of a group of the common stock designated as Class "A," are legal and binding on the parties or void as being prohibited by the Constitution and statutes or as being contrary to public policy. Constitution of Texas, Art. 12; Corpus Juris, Vol. 14, p. 498; Funkhouser v. Capps, 174 S. W., 897; Haldeman v. Haldeman, 197 S. W., 376; Luthy v. Ream, 110 N. E., 376; Morel v. Hoge, 61 S. E., 487; Powers v. People, 79 Atl., 800; Rev. Stats., Texas, Arts. 1303, 1304, 1305, 1320, 1323, 1326, 1327, 1330, 1332, 1333, 1387; Sheppard v. Rockingham Power Co., 64 S. E., 894.

If specifically setting out that each share of stock in banking and railroad corporations entitle them to a vote would indicate that it was not the intention with respect to a general corporation, because it was not specifically set out therein, the fact that the Legislature deemed it necessary to state specifically that corporations of non-par stock may divide such stock into such classes as it sees fit, certainly would indicate that it was the Legislature's opinion that this could not be done under the general corporation laws which govern, according to appellant's own theory, corporations of par as well as non-par stock.

MR. JUDGE NICKELS delivered the opinion of the Commission of Appeals, Section A.

### STATEMENT OF THE CASE.

Xanthull owned a plant and business. He became associated with four other men for corporate purposes. They incorporated as St. Regis Candies, Inc. Xanthull's plant and business, at an agreed valuation, became the property of the corporation received in payment for 510 shares of "Class A Stock" and forty shares of "Class B Stock" of the corporation. The other associates on their part subscribed for the remaining 490 shares of "Class A Stock" and 210 shares of "Class B Stock." Inferably—they paid the requisite proportion in cash and became liable for the remainder of their stock subscriptions. A charter was secured in which the declaration is made that the "capital stock" is $125,000, divided into 1,250 shares of $100 each, and divided further "into two classes, 1,000 shares thereof being known as 'Class A' stock and 250 shares thereof being

known as 'Class B' stock"—it being declared also that "Class B. stock * * * shall have no voting privileges or power * * * no right to participate proportionately in future increases of capital stock * * * and shall be subject to such conditions, restrictions and limitations as may be imposed by the by-laws."

A meeting attended by Xanthull and three of the other associates was held, at which the foregoing charter recitations were definitely approved and at which by-laws were adopted in which: (a) "Class B" stock was restricted as in the charter; (b) future meetings of "Class A" stockholders were provided for; (c) it was provided that each "Class A" stockholder would have one vote for each share of that class of stock owned by him. It was also provided that the owners of "Class B" stock would be entitled to participate in meetings but without voting rights. The selection of directors was by by-law provisions left to "Class A" stockholders as was the matter of by-law amendments. The fifth associate ratified that action.

"Under the agreements of the parties, Xanthull took charge of the business, managed and controlled its affairs * * * undisturbed until the 12th day of January, 1927" (a period of about a year). On that day the associates, save Xanthull undertook to call a special meeting of the directors for a named date and issued notices therefor for the purpose of altering the by-laws so as to revoke the authority of the president (Xanthull) to manage the affairs of the corporation, and to provide for amendment of the charter and by-laws so as "to eliminate the 'Class B' stock and make all of the stock in the corporation have the same rights, powers and preferences." The meeting was held, attended by all five of the associates, and over the protest of Xanthull the holders of "Class B" stock voted as if it were "Class A" stock. The result was that by affirmative vote of those holding 49 per cent of "Class A" stock and 210 shares of "Class B Stock" the changes proposed were ordered; Xanthull voted his 51 per cent of "Class A Stock" in the negative. A charter amendment was filed in the name of the corporation.

January 18, Xanthull, "for himself and in behalf of the St. Regis Candies, Inc.," brought suit against the other associates. The facts already stated were alleged and it was shown, further, that January 19 was the day regularly fixed for annual meeting of stockholders, that the meeting would be held and that the defendants would undertake to "vote 'Class B Stock' and thereby control such meeting and elect directors of their own choosing and undertake to shape the policies of the corporation * * * and deprive him" (Xanthull) "of

the control of the corporation as conferred upon him by his owner-ship of 51 per cent of the 'Class A Stock' and by the terms of the charter and by-laws," etc., etc. It was prayed that defendants be restrained from voting the "Class B Stock" at the meeting or at any other meeting and that the charter and by-laws amendments thereto-fore undertaken be declared void. Restraining order was issued. Defendants answered—alleging the agreements depriving "Class B Stock" of voting rights to be "contrary to the Constitution and stat-utes of this State and against public policy and therefor void." Upon hearing, the injunction prayed for was denied and an appeal was taken by Xanthull and the corporation to the Court of Civil Appeals, First District, wherein the cause is now pending.

That court has certified these questions:

"No. 1. Is the contract entered into between the appellant Xanthull and the appellees, which was carried into the charter of the corporation, by the terms of which Class A stock only had the right to vote, a valid contract, that is, is it binding as against the holders of Class B stock so as to exclude such stock from being voted? In other words, is there any provision in either our Constitution or statutes which demands that stock such as Class B in the present case shall have the right to vote regardless of a provision in the charter of the corporation to the contrary?

"No. 2. Is such contract void as against public policy?"

### OPINION.

The provisions of the charter and by-laws are by the parties assumed sufficient to evidence a contract in respect to preclusion of voting power in the holders of "Class B" stock, so-called. The assumption appears justified on the facts, and we join in its in-dulgence. See Overland Auto Co. v. Cleveland, 250 S. W., 453; Howe Grain & Merc. Co. v. Jones, 21 Texas Civ. App., 198, 51 S. W., 24; 14 C. J., 161, 162, 346, 347; 7 R. C. L., 97, 142, 143.

The parties have treated the rights belonging to "Class B" holders as being rights of stockholders and the agreement in respect thereto (rather, the papers evidencing those rights) as being "stock." Whether in truth such is the character of those rights, or certificates, is a question which may be pretermitted; for the purposes of this case, we treat the rights, or certificates, as being of "stock" char-acter.

Increase or decrease of "authorized" stock (Arts. 1330, 1332, Rev. Stats., 1925), dissolution (Art. 1387, Rev. Stats., 1925) or

other fundamental alteration of corporate purpose, structure or assets, has not been attempted in violation of the agreement; hence, questions pertaining to voting rights touching such proposals, are not directly involved—if involved at all, indirectly so and so far as that subject-matter may throw light upon what implications, if any, are to be drawn from expressed statutory declarations.

This much has been said to posture the questions now presented; what is to be said has no reference to *futuro* situations of any different phase.

In so far as specific constitutional declarations (Art. 12) are concerned, and in so far as relevant, they make up a command to the Legislature (not to the courts or to individuals) to provide by general laws: (a) For creation of corporations; (b) "for the adequate protection of the public;" and (c) "for the adequate protection * * * of the individual stockholders." Except as to named classes of corporations (other than the class to which St. Regis Candies, Inc., belongs), execution of the command has witness in Chapters 1-8 (Arts. 1302-1395), Title 32, Rev. Stats., 1925.

(a) Creation per Statute: Naming of purposes in Chap. 1 is followed in Chap. 2 (Art. 1303), by the declaration that "private corporations" are to be formed "by the voluntary association of three or more persons." In Arts. 1304, 1305, 1307 and 1308 (with exceptions in 1310-1312) certain acts are prescribed for the corporators (and, in Art. 1313, for the Secretary of State) in perfection of the corporate entity. For aught that is shown St. Regis Candies, Inc., was sufficiently born. The abnormality claimed (classification of "stock" in the charter), if it be abnormality, did not prevent corporate life or make the life given subject to forfeiture at will of anybody save, possibly, the State (Staacke v. Routledge, 111 Texas, 489, 241 S. W., 994; Parks v. West, 102 Texas, 11, 18, 111 S. W., 726, and cases there cited).

(b) Protection of the Public: The corporate field in general is marked out in Chap. 1; and in Chap. 2 (Art. 1304) the "voluntary associates" are required to select and publicly name that part of the field which shall encompass corporate activity. The main purpose here is to protect the "public;" first, against too great delegation and any usurpation of power (Northwestern Fertilizing Co. v. Hyde Park, 97 U. S., 659, 666, 24 L. Ed., 1036; Gulf, C. & S. F. Ry. Co. v. Morris, 67 Texas, 692, 4 S. W., 156; North Side Ry. Co. v. Worthington, 88 Texas, 562, 53 Am. St., 778, 50 S. W., 1055; Bowman Lbr. Co. v. Pierson, 110 Texas, 543, 11 A. L. R., 547,

221 S. W., 930) ; and, secondly, by affording the means whereby right to a claimed power or rightful use of an admitted power may be tested.

There must be a fund on hand or available with which to begin business and the amount of it (in so far as it consists of capital stock) must be stated in the charter (Art. 1304). The fund may be wholly in cash or partly in cash and partly in credits represented by unpaid subscriptions (Arts. 1308, 1335, 1338, 1339, 1341, 1343, 1344, 1345). The fund may have constituents in form of "labor done or property * * * received" at proper valuation (Sec. 6, Art. 12, Constitution; Art. 1308, Rev. Stats., 1925). Such is the capital or capital stock in the absolute sense (Furr v. Chapman, Texas Comm. App., 286 S. W., 171; Scottish Union & Natl. Ins. Co. v. Bowland, 196 U. S. 611, 25 Sup. Ct., 345, 350, 49 L. Ed., 619; Lee v. Sturges, 46 Ohio St., 153, 160, 19 N. E., 560, 2 L. R. A., 556). For some corporate purposes (other than those of St. Regis Candies, Inc.), minima, and for others maxima, in respect to the fund, are prescribed (e. g., Art. 1302, Subds. 15, 16, 27 and 40). Undue impairment of the fund or a too large amount of indebtedness accrued is prohibited under corporate death penalty (Chap. 7, Title 32, Rev. Stats., 1925). All this, of course, is primarily in behalf of those to become creditors or strangers otherwise entitled—i. e., "the public." Ownership of the fund is by the corporate entity—distinguishable from members of the body (Powers v. Detroit, G. H. & M. Ry. Co., 201 U. S., 543, 26 Sup. Ct., 556, 50 L. Ed., 806). On familiar principles, interest of a member therein has the characteristics of (a) indirection, (b) subordination to that of creditors, and (c) sequent contingency of realization in the form of profits or return of (or reimbursement for) his contribution. That, in the true sense, is the "share." Ibid.

Since in the fund there may be credits made up of subscriptions in part unpaid, it was thought proper to require in the charter (Art. 1304) a statement of "the number of shares into which" the fund "is divided," and in another paper (Art. 1308) an identification "of each subscriber" with showing of "the amount subscribed * * * and paid" by him. Additional requirements are: A record of "all stock subscribed and transferred" (Art. 1328); furnishing of that information, etc., to execution plaintiffs (Art. 1346).

(c) Protection of Individual Stockholders: A subsidiary purpose underlying each and all of the constitutional and statutory pro-

visions already mentioned is protection of each stockholder against each and all of the others and the corporation and the public.

"General management" of corporate affairs is vested in the directors. Art. 1327. The "voluntary associates" in the beginning must select those officers (Art. 1304)—the manner of their selection being in nowise regulated in the statute. (Their selection in the present instance was in the manner freely adopted by the "associates.") The first board having been thus created, the terms of Art. 1320 so operate as to vest power in the corporate entity "to make by-laws * * * for the management of its property, the regulation of its affairs and the transfer of its stock," to "increase or diminish * * * the number of its directors" and to "appoint and remove subordinate officers and agents as the business of the corporation shall require." "By-laws" are framed by the "directors" (Art. 1326) and are subject to alteration "by a majority vote of the stockholders" cast at a meeting called by the "directors" (Art. 1326). The power "to increase or diminish * * * the number of directors" is conditioned upon "vote of its stockholders" but the "vote" itself is to be governed by "by-laws" consistent "with existing laws."

Authorized increase or decrease of "authorized capital stock" may be secured by action of the directors based upon "a two-thirds vote of all its stock," in the one case, or "a two-thirds vote of all its outstanding stock" in the other (Arts. 1330, 1332). Voluntary dissolution may be had "where four-fifths in interest of all stock outstanding shall vote" therefor "at a stockholders' meeting" or "when, without a stockholders' meeting, all the stockholders * * * consent in writing." Art. 1387. In respect to action taken or proposed under these provisions (i. e., Arts. 1330, 1332 and 1387) and action taken or proposed in respect to other fundamental alterations of the corporate purpose, structure and properties, and for instant purposes, two assumptions are indulged in favor of the holders of "Class B" stock, so-called: (a) Every stockholder is entitled to vote, and, (b) those owners are "stockholders."

We have generally reviewed the constitutional and statutory provisions mentioned above for the purpose of indicating that no expressed declaration of voting right in a stockholder exists, save in the exceptional instances last mentioned and on the assumptions there made. If the right exists in virtue of law it rests in implication.

The fact that the Legislature, in execution of the command given, made specific provision for voting rights in what we have called the exceptional situations and omitted provision therefor in other cases

is not without cogency. With the exact subject of voting-rights present in the minds of the lawmakers, a specific enactment for named conditions and silence in respect to other conditions would seem to indicate a purposed omission in deference to liberty of contract.

There are other situations of like import:

(a) The general requirements of Art. 12 of the Constitution have reference to railroad and insurance corporations—as well as to corporations generally. But in executing the command the Legislature put railroad corporations into a class (Title 112, Arts. 6259-6534, Rev. Stats., 1925), and insurance corporations into another class (Title 78, Arts. 4679-5068, Rev. Stats., 1925).

In Art. 6289 certain "rules" are named to be controlling in the "election of the board of directors" of a railroad corporation. Among the rules is this: "Each stockholder shall have the right to vote * * * for the number of shares of stock owned by him for as many persons as there are directors to be elected." The matter of "by-laws" is the subject of Art. 6293, and it is there said that "the stockholders of the corporation shall be entitled to one vote for each share of stock held by them." Comparable provisions are made for "life, health and accident insurance" corporations (Art. 4718), "mutual assessment accident companies" (Art. 4789), "mutual life insurance companies" (Art. 4801), and "mutual insurance companies" (Art. 4868), and omitted in respect to various other classes of "insurance companies," etc.

(b) By the terms of Sec. 16, Art. 16, Constitution, the Legislature is required to provide, by general laws, for the incorporation of "bodies with banking and discounting privileges, for supervision, etc., and for adequate protection and security of depositors and creditors. Execution of the requirement has general evidence in Title 16, Rev. Stats., 1925 (Arts. 342-548). Amongst other things, it is there provided (Art. 503) that "in the election of directors and in deciding all questions at meetings of shareholders * * * each shareholder shall be entitled to one vote on each share of stock held by him." In Art. 504 the general right thus declared is specifically preserved to an executor, administrator, guardian or trustee (i. e., he "shall represent the shares of stock in his hands at all meetings of the corporation, and may vote as a shareholder") and to a pledgor (who "may nevertheless represent" his pledged stock "at all such meetings and may vote accordingly as a stockholder").

There is, it seems to us, recognition (at least prima facie) of that freedom of contract necessary for the present agreement in its

present aspects in the terms of the "Non-par Corporation" statute, enacted in 1925. Chap. 19a, Rev. Stats., 1925. In the first section of the Act (Art. 1538a), authority is given new corporations and pre-existing ones, except those "authorized to conduct a banking or insurance business," to make provision for "issuance of its shares of stock without nominal or par value." It is there said that "every such share shall be equal in all respects to every other such share, except that the charter or any amendment may provide that such shares should be divided into different classes, the shares of each class to have such preference, designations, rights, privileges and powers and to be subject to such restrictions, limitations and qualifications as shall be stated in the charter or any amendment thereof." "Any private corporation for profit, other than corporations organized to conduct a banking or insurance business," it is said in Art. 1538h, having authorized shares with par or face value, or shares without nominal or face value, or both, may, by vote of the holders of a majority of its outstanding stock *entitled to vote* at any annual meeting or at any special meeting called and held for the purpose, amend its charter so as to change its shares of stock with par or face value, or any class or classes thereof, * * * into * * * shares without nominal or face value * * * provided * * * that the preferences, rights, limitations, privileges and restrictions granted or imposed with respect to any shares of outstanding stock shall not be impaired, diminished or changed without the consent of the holder thereof." On the words of the statute, at least, there may be par value stock of a corporation (having no other kind) which may not be entitled to vote at a meeting held to determine change to a non-par corporation and the pre-existing "preferences," etc., are to continue (the change notwithstanding) unless the "holder" of the preferred or restricted stock (consent) to a different result.

In its unrestricted scope, "public policy" is most vague in its expressions and implications—in the general manner of "fraud." Story on Contracts, Sec. —. For instant purposes it may be taken in these aspects: (a) When the lawmakers speak·upon a subject over which they have constitutional jurisdiction, their words define the "public policy" of the subject. United States v. Trans-Missouri Freight Assn., 166 U. S., 290, 340, 17 Sup. Ct., 540, 41 L. Ed., 1007. Touching the subject in mind, they have not directly spoken contrary to what was agreed upon, nor have they used language upon which an inference against the right to agree and execute must be erected. (b) "The very meaning of 'public policy,' " when used

by an obligee against consensual obligation and performance "is the interest of others than the parties." Beasley v. Texas & P. Ry. Co., 191 U. S., 492, 498, 24 Sup. Ct., 164, 48 L. Ed., 274. In the situation presented it is difficult to perceive harm to the public in allowing able-minded men, dealing at arms length, to contract with reference to their own property and the conditions upon which a transfer of it to their corporate representative shall be made. (c) An important requirement of policy is "that men of full age and competent understanding shall have the utmost liberty of contracting and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice" unless, perchance, contravention of public right or welfare very clearly appears. Missouri, K. & T. Ry. Co. v. Carter, 95 Texas, 461, 68 S. W., 159; Baltimore & O. S. W. Ry. Co. v. Voigt, 176 U. S., 498, 20 Sup. Ct., 385, 44 L. Ed., 560; Printing & N. R. Co. v. Sampson, 19 Eq. Cas. (L. R.). The claim of invalidating public policy is not sufficiently grounded to have warrant for striking down the agreement in question. For cases more or less in point on the general question see: Reagan Bale Co. v. Heuermann, 149 S. W., 228; Langben v. Goodman, 275 S. W., 841; Storrow v. Texas Compress, etc., Co., 87 Fed., 612; Allen v. Montana Ref. Co., 71 Mont., 105, 227 Pac., 582; State v. Swanger, 190 Mo., 561, 2 L. R. A. (N. S.), 121, 1 Ann. Cases, 563, 89 S. W., 872; People v. Koenig, 118 N. Y. S., 136, 133 App. Div., 756; Kent v. Quicksilver Mining Co., 75 N. Y., 159; Millspaugh v. Cassidy, 191 App. Div., 221, 181 N. Y. S., 276; Wilson v. Parvin, 119 Fed., 653; Hamlin v. Ry. Co., 78 Fed., 664; Miller v. Ratterman, 47 Ohio St., 141; Commonwealth v. Detwiller, 131 Pa. St., 614; Gen. Invest. Co. v. Bethlehem Steel Co., 87 N. J. Eq., 234, 100 Atl., 347 (cited by appellants); Funkhouser v. Capps, 174 S. W., 897; Haldeman v. Haldeman, 176 Ky., 635, 197 S. W., 376; Luthy v. Ream, 270 Ill., 170, Ann. Cases, 1917 B, 358, 110 N. E., 376; Morel v. Hoge, 13 Ga., 625, 16 L. R. A. (N. S.), 1136, 14 Ann. Cases, 935, 61 S. E., 487; Powers v. People, 79 Atl., 800; Sheppard v. Rockingham Power Co., 150 N. C., 776, 64 S. E., 894; Gage v. Fisher, 5 N. D., 297, 65 N. W., 809, 31 L. R. A., 557; People v. Emerson, 302 Ill., 300, 21 A. L. R., 636, 134 N. E., 710; Brooks v. State, 3 Boyce, 1 (Del.), 79 Atl., 800, 51 L. R. A. (N. S.), 1126, Ann. Cases, 1915 A, 1133; Durkee v. People, 155 Ill., 354, 40 N. E., 628; State v. Anderson, 31 Ind. App., 34, 67 N. E., 208 (cited by appellees).

We recommend the questions certified be answered as follows: No. 1: "So far as presently involved, at least, the contract is binding upon the holders of 'Class B Stock.'" No. 2: "No."

Opinion of the Commission of Appeals answering certified questions is adopted and ordered certified to the Court of Civil Appeals.

C. M. Cureton, Chief Justice.