Guilford GLAZER, Appellant,

v.

Jerome S. GLAZER and Louis A. Glazer, Appellees.

Jerome S. GLAZER and Louis A. Glazer, Appellants,

v.

Guilford GLAZER, Appellee.

No 21931.

United States Court of Appeals Fifth Circuit.

Jan. 10, 1967.

Rehearing Denied May 2, 1967.

R. Emmett Kerrigan, New Orleans, La., for appellant. Deutsch, Kerrigan & Stiles, René H. Himel, Jr., Bernard Marcus, New Orleans, La., of counsel.

Harold R. Ainsworth, New Orleans, La., James C. McKay, Alfred H. Moses, Edward J. Grenier, Jr., Washington, D. C., for appellees-appellants. Covington & Burling, Washington, D. C., of counsel.

Before JONES, WISDOM, and GEWIN, Circuit Judges.

**WISDOM, Circuit Judge:**

This action results from brothers fighting among themselves for the family's business enterprises. Guilford Glazer seeks damages for breach of contract against his two brothers, Jerome and Louis, for stripping him of office, salaries, and bonuses in eighteen family corporations. The two younger brothers admit the expulsion, but they deny any liability for damages. The jury awarded the plaintiff $1,900,000 in damages. The trial judge—without giving any reasons for his decision—gave the judgment to the defendants notwithstanding this verdict. The plaintiff appeals the judgment n. o. v. The defendants cross-appeal conditional orders denying them a new trial or a remittitur. We reverse the judgment n. o. v. and remand for a remittitur and, if the plaintiff refuses, we require a new trial limited to the issue of damages.

## I.

### BACKGROUND

The plaintiff's claim in this action rests upon an agreement the three brothers entered into December 30, 1957.[1]

1. "AGREEMENT

THIS AGREEMENT made and entered into the 30th day of December, 1957, by and between GUILFORD GLAZER, hereinafter referred to as the First Party, LOUIS A. GLAZER, heerinafter referred to as the Second Party, and JEROME S. GLAZER, hereinafter referred to as the Third Party,

WITNESSETH:

WHEREAS, the parties hereto are the owners of stockholdings in various close corporations (hereinafter referred to as 'the corporations,'), and,

WHEREAS, it is contemplated that they will own stock in other closely held corporations to be organized in the future, and,

WHEREAS, heretofore on the 24th day of February, 1951, the parties hereto executed an agreement which provides, among other things, that if loss should accrue to then, or either of them by reason of the execution of any bond, contract, or agreement, or by reason of the signing as indemnitor, surety, or guarantor on any bond or contract of indemnity, they shall bear the loss equally, and

WHEREAS, from time to time disputes and differences have arisen between the parties as to the ownership of certain shares of stock, their respective duties and obligations to each other and to the corporations, as well as their right to engage in outside ventures separate and apart from each other, and,

WHEREAS, it is recognized that in order to continue their present relationship, to carry on their various business enterprises successfully and for the welfare of each of the parties, it is necessary that they more clearly define their respective rights, duties and liabilities to and toward each other and with respect to the corporations, and

WHEREAS, it is also the desire of the parties to enter into the mutual release hereinafter set out,

NOW, THEREFORE, in consideration of the premises, and of the mutual covenants herein contained, the parties hereto do hereby agree as follows:

1. That certain indemnity agreement dated the 24th day of February, 1951, date of these presents.

is hereby cancelled effective as of the

2. The First Party agrees to deliver certain shares of stock to the Third Party and to cause Oak Ridge Properties, Inc., of which he is the sole stockholder, to settle its disputed account with Glazer Steel Corporation for the sum of $231,684.30, payment to be made at such time as Oak Ridge Properties, Inc. has funds available.

3. The authorization of the Board of Directors of the respective corporations

The contract, an unusual one, does not fit into the mold of an employment contract or agreement for control. The plaintiff asserts that this contract, read as a whole, protects him against unjustified expulsion from his directorships and offices in the Glazer family corporations. The defendants construe the agreement as specifically reserving for them the voting power to do what they did. The trial court decided, correctly, we think, that a jury could find the agreement ambiguous and admitted extensive extrinsic evidence to aid in its construction.

The father of the Glazer brothers conducted a small scrap metal business in Knoxville, Tennessee, before World War II. Guilford Glazer, the plaintiff, and his brother Louis worked with their father in this business until his death in 1939. Guilford and Louis and their brother Jerome all served in the war. During their absence, their mother, Ida B. Glazer, and a brother-in-law, I. B. Cohen, carried on the business.

Guilford was the first brother to return from the war. He organized the Glazer Steel Corporation to take over the old scrap business and to expand into other fields. The corporation issued shares to Jerome and Louis on their return. The allocation was Guilford—30 per cent; Jerome and Louis—each 25 per cent; and I. B. Cohen—20 per cent. The Glazer Steel board of directors included the three brothers, their mother, Mrs. Ida Glazer, brother-in-law Cohen, and an uncle named Harry Busch. Guilford was president and chairman of the board of Glazer Steel; Louis was vice-president and secretary; Jerome was the treasurer.

Glazer Steel enjoyed spectacular growth and success in the years immediately following the war. However, the

shall be obtained before any extraordinary commitment, or capital expenditure, or any transaction outside of the normal course of business is made.

4. Nothing herein shall in any wise restrict or prohibit either of the parties from undertaking or engaging in outside ventures, nor from using the facilities of the corporation upon the payment of a reasonable consideration therefor.

5. In all matters pertaining to their respective operations, or in joint ventures or related activities, the corporation shall each bear their proportionate share of expenses.

6. The parties ~~shall each continue to work in their present capacities and~~ shall receive such salaries, bonuses, and dividends as the Board of Directors of the corporations shall authorize and declare.

7. For the aforesaid consideration, as well as for other good and valuable considerations, flowing from each to the other, receipt of which is acknowledged, the First Party, Second Party, and Third Party, respectively, do each hereby remise, release and forever discharge all of the others and each other their respective heirs, executors, administrators and assigns, from any and all payments, claims, demands, actions or liability of any kind whatsoever in law or in equity, they or any of them may have against the other or each other, from the beginning of the world up to the date of these presents, excepting, however, the agreements and obligations of GUILFORD GLAZER, LOUIS A. GLAZER, and JEROME S. GLAZER TO each other as set forth in this agreement.

8. The parties agree to and with each other to make every effort to create a good, healthy, and harmonious relationship; to refrain from causing dissension and arguments and from unnecessarily interfering with the welfare or duties of each other and from doing or causing anything to be done that is contrary to the purposes and intent of this agreement.

IN WITNESS WHEREOF the parties hereto have executed this agreement in triplicate this the day and date first above written.

GERTRUDE A. WALLACE

PAUL F. ROACH

FRANK L. DIGGS
Witnesses

GUILFORD GLAZER
First Party

LOUIS A. GLAZER
Second Party

JEROME S. GLAZER
Third Party"

recession of 1949–1950 sharply reduced the profits of the company. To increase its earnings, Glazer Steel in 1949 opened a New Orleans branch that eventually became the headquarters of the company. Moreover, the brothers, largely under Guilford's leadership, formed about twenty more corporations between 1949 and 1957 to engage in other businesses— real estate development, construction, television broadcasting, machinery leasing, and insurance. The brothers' proportionate holdings in these additional corporations, with several important exceptions, were similar to those in Glazer Steel. Other members of the family, and occasionally outside business associates, received shares in a few of the new companies.[2] At the time of Guilford's expulsion from the management, the

2. The following is a list of the eighteen family corporations from whose management Guilford Glazer was expelled.

| Name of Corporation | Guilford's Ex-capacity | Year Organized | State of Incorporation |
|---|---|---|---|
| 1. Glazer Steel Corp. | Pres. & Chmn. | 2/21/46 | Tenn. |
| 2. Mayfair Village Corporation | Pres. | 8/16/49 | Florida |
| 3. Troy Construction Corp. | Vice-Pres. & Chmn. | 3/17/50 | Tenn. |
| 4. Tennessee Television, Inc. | Pres. | 1951 or 1952 | Tenn. |
| 5. The Swifton Corp. | Pres. | 1/12/56 | Ohio |
| †6. The Jerome Corp. | Vice-Pres. & Secy. | 1/8/52 | Tenn. |
| #7. G & K Machinery, Inc. | Vice-Pres. & Secy. | 1/8/52 | Tenn. |
| *8. Trustee Corp. | Pres. & Treas. | 6/12/52 | Tenn. |
| 9. Glencoe, Inc. | Pres. | 7/8/53 | Tenn. |
| 10. Barbizon Terrace, Inc. | Vice-Pres. | 12/24/53 | Tenn. |
| 11. Builders Investments, Inc. | Vice-Pres. | 4/16/54 | Tenn. |
| 12. Roach Ins. Agency, Inc. | Vice-Pres. | 12/24/54 | Tenn. |
| 13. General Development Corp. | Pres. | 9/23/55 | Ohio |
| 14. Drake Apartments, Inc. | Vice-Pres. | 5/26/55 | Tenn. |
| *15. Magnolia Apartments, Inc. | Pres. | 6/24/55 | Tenn. |
| *16. West Virginia Development Corp. (40 per cent non-family interest) | Pres. | 1/31/56 | W.Va. |
| 17. Swifton Management Corp. | Pres. | 7/12/56 | Tenn. |
| 18. Park Management Corp. | Pres. | 11/12/57 | Tenn. |

*Corporation with outside shareholders.
†Jerome Glazer was sole shareholder.
#Louis Glazer was sole shareholder.

Guilford Glazer retained his offices in three other family corporations in which he apparently had voting control:

| Name of Corporation | Year Organized | State of Incorporation |
|---|---|---|
| * 1. Colonial Village Corp. | 6/20/50 | Tenn. |
| *2. Shelbourne Towers, Inc. | 6/27/50 | Tenn. |
| 3. Champion, Inc. (Guilford sole shareholder) | 1/ 8/52 | Tenn. |

* Corporation with outside shareholders

Guilford Glazer by himself owned and controlled five additional corporations at the time of the December 30, 1957, agreement among the brothers. These five companies were primarily involved with Guilford's shopping center at Oak Ridge, Tennessee.

1. Oak Ridge Properties, Inc.
2. Allied Construction Corp.
3. Downtown Management Corp.
4. Downtown Promotions, Inc.
5. Tennessee Investment Corp.

Reference to Glazer family corporations owned entirely by the litigants includes those corporations owned in whole or part by the litigants' wholly-owned corporations, principally Glazer Steel Corporation.

Glazer family corporations had attained an aggregate net worth of well over five million dollars.

In 1955 the Glazers' brother-in-law, I. B. Cohen, withdrew from all the family corporations in which he had an interest, and the companies repurchased his stock.[3] As a result, Guilford's interest in Glazer Steel increased to 38.12 per cent; Jerome's and Louis's each became 30.94 per cent. At the time of Guilford's expulsion, the brothers were the sole shareholders (directly or indirectly) of Glazer Steel and about fifteen other family corporations. They held control of five additional family corporations that had one or more outside shareholders.

The three brothers drew income from their corporations chiefly in the form of salaries and bonuses. In the late 1950's, virtually all these salaries and bonuses were paid by Glazer Steel. In the early 1950's, several of their other corporations, including two with outside shareholders at that time, had also paid salaries to the brothers. Glazer Steel generally paid salaries and bonuses in close proportion to the brothers' stockholdings in the corporation. Thus Guilford received about 17 per cent more salary and bonuses than his brothers before his expulsion.

The decade before Guilford's expulsion was marked by frequent disputes among the Glazer brothers. The major causes of dissension were (1) Guilford's retention of sole ownership of several corporations, particularly those responsible for his Oak Ridge, Tennessee shopping center; (2) the diversion of Guilford's time from the daily operation of Glazer Steel to the development of other family corporations and enterprises owned solely by him; (3) the use of Glazer Steel facilities, personnel, and supplies by other family corporations and Guilford's own companies for purportedly inadequate and tardy compensation.

The brothers made numerous attempts in the late 1950's to resolve their differences. The conflicts among them, particularly between Guilford and Jerome, reached a peak in 1957. Jerome suggested that the brothers separate their business interests. Nonetheless, the brothers continued efforts toward reconciliation.

December 30, 1957, they entered into the agreement that forms the basis of this case.[4] On the same date, the brothers and twenty-two family corporations (five of them wholly-owned by Guilford) entered into a written release of all past claims against one another.[5] This mu-

---

3. Glazer Steel Corporation repurchased I. B. Cohen's stock under a November 19, 1952, agreement among the three Glazer brothers and him. This contract provided that before any of the parties could sell his stock in Glazer Steel to a third party, it had to be offered first to the corporation for purchase. The plaintiff concedes that the instant suit is not based on the 1952 contract, but he argues that the old agreement exemplifies the close familial and business relationship of the parties prior to his expulsion.

4. See footnote 1.

5. The release reads: "THAT in order to carry out the intents and purposes of a certain agreement dated the 30th day of December, 1957, between GUILFORD GLAZER, LOUIS A. GLAZER, and JEROME S. GLAZER, to which reference is here made, and in consideration of the sum of Five ($5.00) Dollars paid

by each of the parties hereto to each other as well as for other good and valuable considerations, receipt of all of which is acknowledged by each and every party, GLAZER STEEL CORPORATION, [and all the other corporations, each named] * * * and GUILFORD GLAZER, LOUIS A. GLAZER, and JEROME S. GLAZER, individually, being all of the parties hereto, do each hereby remise, release, and forever discharge all of the others and each other, their respective successors, assigns, heirs, executors, and administrators, from any and all payments, claims, demands, actions or liability of any kind whatsoever in law or in equity they or any of them may have against the others or each other from the beginning of the world up to the date of these presents, excepting therefrom, however, the agreements and obligations of GUILFORD GLAZER, LOUIS A. GLAZER, and JEROME S.

tual release professed "to carry out the intents and purposes" of the December 30, 1957, agreement by cancelling the various debts and set-offs among the parties.

The December 30 agreement and the contemporary mutual release failed to end the disputes among the Glazer brothers. Jerome and Louis complained that Guilford reneged on a promise to give them a share in Ark Bowling Lanes, a bowling alley in the Oak Ridge shopping center. They charged that Glazer Steel was not properly reimbursed for its facilities, personnel, and supplies in the construction of this bowling alley. They were affronted by Guilford's announcement early in 1958 that he was moving to California and taking the headquarters and records of Glazer Steel with him.

In March 1959 the brothers resumed negotiations to separate their business interests. A representative of Jerome and Louis threatened Guilford with removal from office if he did not agree to sell his interests to the defendants. In May 1959, in light of this threat, Guilford requested that his brothers sign a new shareholders' agreement. He proposed a conventional ten-year control and employment agreement, with restrictive-transfer and first-refusal repurchase provisions. Jerome and Louis refused to sign this agreement. June 3, 1959, Guilford wrote the defendants a letter suggesting still another agreement "to remove opportunity for future disputes." Negotiations continued over the summer with no success.

The last act of this corporate drama unfolded in the autumn of 1959. Jerome and Louis called a shareholders' meeting of Glazer Steel Corporation for September 25, 1959. September 15 Guilford offered yet another proposal for a new agreement, this time suggesting that Jerome become president of Glazer Steel, that salaries of the brothers be equalized, and that major transactions in the future receive unanimous consent of the three brothers. Guilford's proposal stated his belief that the December 1957 agreement was still valid. September 18 the brothers assembled as the board of directors of Glazer Steel in a special meeting called by Guilford. The brothers unanimously agreed not to transact any business at this meeting but to continue their negotiations. Rapprochement eluded them. The September 25 Glazer Steel shareholders' meeting, called by Jerome and Louis, set the stage for Guilford's ouster. The by-laws were amended to accelerate the next annual meeting of the company to the first Wednesday in October, twelve days later. Guilford vainly protested that this amendment was part of a plan to expel him as quickly as possible from the management of the company. He reiterated his rights under the December 1957 agreement.

October 7, 1959, in accordance with the amended by-laws, the Glazer Steel Corporation held its accelerated annual meeting. Guilford again urged that his right to office was protected under the December 1957 agreement. It was to no avail. The defendants, voting the majority of the stock, elected a slate of directors that excluded Guilford. Following the shareholders' meeting, the new board of directors elected Jerome president and treasurer and Louis vice-president and secretary. Guilford received no office. The defendants were given substantial increases in salary[6]

GLAZER TO each other as set forth in the said agreement of the 30th day of December, 1957, hereinabove referred to, and except for such indebtedness as is reflected on the books of account or records of each of the corporate parties hereto, as owing to each other, in the amount or amounts stated as of June 30, 1957, plus any adjustments thereto arising out of transactions subsequent to said date.

IN WITNESS WHEREOF, the corporate parties have caused this instrument to be executed in their respective corporate names by their duly authorized officials, and by their respective Boards of Directors, and the individual parties have affixed their signatures, this the 30th day of December, 1957."

6. The board authorized an increase in annual salary for Jerome and Louis from

Guilford was awarded a termination payment of $15,269.

October 23, 1959, Jerome and Louis executed a ten-year stockholders voting trust agreement.[7] October 31 they summarily demanded that Guilford resign his offices in seventeen other family corporations.[8] November 6 Guilford obligingly resigned his offices in all the corporations that his brothers requested. His letter of resignation stated that he was resigning "strictly through pressure and demand of the majority stockholders * * * in violation of * * * the agreement dated December 30, 1957." He once more demanded adherence to the December 1957 agreement and again called upon his brothers "to arbitrate for a fair and equitable separation" of their interests. November 10, 1959, the defendants convened a special joint meeting of the shareholders of the seventeen additional corporations to accept Guilford's resignations.

Glazer Steel paid Guilford no salaries or bonuses after January 1960.[9] Guilford moved to Beverly Hills, California later in 1960 to pursue various private business ventures. He took with him to California, without permission of the new officers of Glazer Steel, certain furniture, automobiles, and records of the company from its office in Knoxville.

November 14, 1960, Guilford, a citizen of California, filed this diversity action in the Eastern District of Louisiana against his two brothers, both citizens of Louisiana. His complaint alleged that the defendants had "conspired with one another to breach * * * [the December, 1957] agreement * * * by pooling their controlling stock interests in * * * [Glazer Steel and certain 'other related'] corporations and removing plaintiffs as officers and directors [sic] thereof." The complaint also asserted that the "conspiracy and conduct on the part of defendants constituted a breach of the purposes and intent" of the December 1957 agreement. The plaintiff alleged $360,000 actual damages, later amended to $600,000, and demanded recovery under the Tennessee treble damages statute for conspiracy. Tenn.Code Ann. § 47–1706, since renumbered § 47–15–113. During the trial the plaintiff attempted to withdraw his claim for treble damages under the conspiracy statute, but he never amended his complaint to reflect this change, and the trial judge included conspiracy in the jury charge.

## II.

### Basis of Plaintiff's Claim

The December 30, 1957, agreement is the heart of the plaintiff's claim. The plaintiff also relies upon the contemporaneous mutual release of past claims to the extent that it shows the consent of outside shareholders to the agreement among the brothers. The plaintiff as-

$40,718 to $55,000. See also note 9 infra.

7. Guilford has filed two separate actions seeking cancellation of the voting trust agreement and later employment contracts entered into by Glazer Steel and the defendants after his expulsion. Glazer v. Glazer et al., Civil Action No. 11,-605; Glazer v. Glazer Steel Corp., et al., Civil Action No. 11,471, both in the United States District Court for the Eastern District of Louisiana.

8. See note 2 supra.

9. Guilford did draw substantial compensation from other family companies after his expulsion from the management of Glazer Steel. He received $24,000 from Shelbourne Towers Corporation; and

$12,000 from Colonial Village, Inc., two corporations in which he held the controlling interest. He also drew $15,000 in salary from his Ark Bowling Lanes and a $259,960 "advance" from his Oak Ridge Properties, Inc.

July 26, 1960, Glazer Steel Corporation entered into ten-year employment contracts with the defendants. The agreements reflected the increase in annual salary from $40,718 to $55,000 that had been authorized at the October 7, 1959, board of directors meeting. January 1, 1961, each of the defendants also began to draw $1000 a month from the General Development Corporation. In the year ending September 30, 1962, each of them drew $2600 from the Troy Construction Corporation.

serts that the December 1957 agreement entitled him to remain in his capacities as an officer and director of the Glazer family corporations even though he was a minority shareholder. He contends that he complied with all his obligations under this agreement.

The defendants concede that the plaintiff fulfilled several specific promises in the agreement, such as the transfer of stock in Oak Ridge Properties, Inc. to Jerome Glazer (Paragraph 2). But they contend that the plaintiff himself violated, or at least abandoned, his principal obligations under the agreement. They argue that (1) the December 1957 agreement, by its own terms, did not entitle the plaintiff to remain in office and receive compensation for any period. of time; (2) that the agreement was terminable at the will of the parties; (3) that paragraph 8 of the agreement, upon which the plaintiff relies, in part, is unenforceable on account of vagueness· and uncertainty; (4) that the· agreement, if construed as the plaintiff would construe it, would be illegal and thus unenforceable; (5) that, as a matter of law, the defendants could not have conspired to breach the agreement; and (6) that, in any event, the conspiracy theory is barred by one-year Louisiana prescription statute. Moreover, they assert (7) that the $1,900,000 verdict was excessive and unsupported by the weight of the evidence; and (8) that the trial court erroneously left to the jury the question as to whether the December 1957 agreement was ambiguous.

### III.

#### Judgment n. o. v. for defendant

■■ The trial court's action, granting the judgment n. o. v. for the defendant and conditionally denying a new trial or remittitur, is subject to full review by this Court. The trial judge's order is an order nisi. Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147. We have broad authority under the amended Rule 50(c),

F.R.Civ.P., to set out an appropriate subsequent disposition below. See 5 Moore, Federal Practice ¶ 50.12 (2d ed. 1965 Supp., 171–173). The defendant's motion for judgment n. o. v. presented solely a question of law. The trial court had power to enter judgment n. o. v. only for one reason—the absence of any substantial evidence to support the verdict. See Danko v. Lewy, 5 Cir. 1945, 149 F.2d 66; Pratt v. Louisiana & A. Ry., 5 Cir., 1943, 135 F.2d 692; 2B Barron & Holtzoff, Federal Practice and Procedure § 1079 (Wright ed. 1961). The court could not weigh the evidence in making this determination. That the trial court did not divulge the reasons for its judgment obviously makes a difficult case more difficult.

■■ The defendants could not assert a ground not included in their motion for a directed verdict. Lewis v. Mears, D.C.Pa.1960, 189 F.Supp. 503, aff'd, 3 Cir. 1961, 297 F.2d 101, cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276. We therefore test the judgment n. o. v. by the standards of deficiency asserted by the defendants in their motions for directed verdict and judgment n. o. v. and repeated in their appeal ˙briefs. We find that the judgment n. o. v. was not justified on any of the grounds advanced by defendants.

Central to this controversy is the question: What did the parties mean? The arguments reflect a clear divergence of interpretation. The parties differ on the essential purpose of the agreement as well as the meaning of its specific terms. The plaintiff bases his claim wholly upon this agreement. He does not invoke general principles of corporate law that protect against fraud, self-dealing, or ·corporate manipulation. None of the Glazer corporations has been made a party to the action. The plaintiff's two brothers are the only defendants. The parties seem to agree that Tennessee law governs the interpretation, construction, and legal effect of the agreement since

it was executed in that state. See LSA-Civil Code, Art. 10.[10]

A. *Construction.* The defendants contend that the December 30, 1957, agreement provides no basis for the plaintiff's claim. They argue that the intent of the parties is stated clearly within the four corners of the agreement; that paragraph 6 specifically and unambiguously relieves them of any personal obligation:

> 6. The parties shall each continue to work in their present capacities and shall receive such salaries, bonuses, and dividends as the Board of Directors of the corporations shall authorize and declare. (Deletion initialed in original.)

The defendants view this provision as delegating to the directors of the various corporations the sole authority to order compensation. They see nothing else in the agreement that would require them, as the directors and shareholders of most of the corporations, to continue compensation for Guilford Glazer. The defendants do not consider any other language of the contract to give Guilford Glazer a specific right to continued compensation by them. Under the defendants view, the agreement as a whole merely wiped clean the slate of past dissension in exchange for certain concessions and mutual promises to abide by standard corporate practices and procedures in the future. They assert that the parties agreed only that "they more *clearly define* their respective rights, duties and liabilities to and toward each other and with respect to the corporations * * *" (Emphasis added) as stated in the Fifth Whereas Clause. They agreed to attempt to operate the corporations on a more businesslike basis than before. The parties clearly did not agree, the defendants argue, to alter drastically their "present relationship" by relinquishing the most significant and important power of a stockholder, i. e., the power to vote his own stock freely in accordance with his own wishes. The parties did not agree to freeze their present relationship, but only to define and clarify it. As further evidence of this, the defendants point to the deletion in paragraph 6 of the clause that the parties "shall each continue to work in their present capacities." The defendants also note that Guilford Glazer attempted to replace the December 1957 agreement with more specific control and employment contracts in subsequent months. Since paragraph 6 of the contract clearly relieved them of liability, say the defendants, the trial court erred in sending the contract to the jury for construction.

The plaintiff urges that the agreement *read as a whole* sufficiently supports his claim to sustain the verdict. He asserts that paragraph 6 does not on its face relieve his brothers of liability for his continued compensation. The remainder of the agreement he finds ambiguous. In plaintiff's view, it was correct for the court to send the agreement to the jury with extrinsic evidence to determine the actual intent of the parties. By the terms of the contract, the intent of the parties was "to continue their present relationship, to carry on their various business enterprises successfully" (Fifth Whereas), "to refrain * * * from unnecessarily interfering with the welfare or duties of each other" and "to make every effort to create a good, healthy, and harmonious relationship" (Paragraph 8).

---

10. Art. 10. "The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed. But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect. The exception made in the second paragraph of this article does not hold, when a citizen of another State of the Union, or a citizen or subject of a foreign State or country, disposes by will or testament, or by any other act *causa mortis* made out of this State, of his movable property situated in this State, if at the time of making said will or testament, or any other act *causa mortis*, and at the time of his death, he resides and is domiciliated [with his family] out of this State."

■ We conclude that it was proper for the court to leave interpretation of the agreement to the jury. The jury could find that the contract as a whole created rights to the continued compensation the plaintiff claims in this action.

■ (1) The defendants' assertion that paragraph 6 specifically relieves them of personal liability is erroneous. Paragraph 6 itself is ambiguous. Does it, as defendants argue, merely restate a formula of state law and corporate by-laws? Does it mean, as the plaintiff contends, that the parties will vote their shares and act as directors to cause continued participation and compensation for all the brothers? Or does it mean something else? Several interpretations are possible. Therefore, the court correctly refused to hold that paragraph 6 relieved defendants of liability. Like the rest of the contract, paragraph 6 presented a question of interpretation for the jury. Similarly, we can dismiss the defendants' argument that the specificity of Paragraph 6 should override other allegedly inconsistent more general provisions of the agreement. Since paragraph 6 itself is ambiguous, it could either be consistent or inconsistent with the other provisions. The court properly left this problem for the jury.

The initialed deletion of the phrase "shall each continue to work in their present capacities" in paragraph 6 of the final agreement does not clearly authorize the majority to expel a minority party. The jury could find, among other things, that the deletion was intended merely to preclude freezing of the exact current capacities of each brother, but that the phrase was not intended to eliminate the protection against a complete squeeze-out from the management. It could find that the brothers intended the deletion to maintain flexibility and allow periodic reorganizations within the business.[11] This is quite different from authorizing an abrupt expulsion of one brother from all the Glazer enterprises.

(2) The remainder of the contract could be found by a jury to support Guilford Glazer's claim. The Fifth Whereas Clause and paragraph 8 could be construed, with extrinsic evidence, as creating a mutual obligation not to destroy the present business relationship of the parties. From the pledges "to continue, * * * to carry on" (Fifth Whereas), "to refrain from * * * unnecessarily interfering with the welfare of duties of each other * * * or causing *anything* to be done that is contrary to the purposes and intent of this agreement" (Paragraph 8, emphasis added), the jury could find a broad mutual promise not to expel a minority party from the family enterprise. These are broad promises to be sure. The determination of the plaintiff's rights under such ambiguous language could be no easy matter. We hold, however, that a jury could find no absolute, arbitrary, and abrupt squeeze-out to be a violation of these broad promises. The jury properly was allowed to consider all parts of the contract and all the steps in its negotiation and execution. See United States v. Croft-Mullins Elec. Co., 5 Cir. 1964, 333 F.2d 772, 781; City of Memphis, Tenn., for and on Behalf of Memphis Light, etc. v. Ford Motor Co., 6 Cir. 1962, 304 F.2d 845, 849.

■ (3) We consider the extrinsic evidence surrounding the negotiation and execution of the agreement is sufficient to enable a jury to find the agreement a basis for plaintiff's claims in this action. The jury could find that "to continue their present relationship" meant to continue the basic tripartite structure of ownership, management, and compensation, elaborately described in the courtroom, that had existed for the previous sixteen years. It could find the "present relationship" included membership generally in the corps of officers and directors of the various Glazer corporations. The record swells with evidence of prearrangement dissension among the

11. Jerome Glazer, who requested the deletion, later testified that he struck out the language "because I did not feel that I should be required to stay on *any particular job within the Glazer complex corporation*". (Emphasis added.)

brothers. The jury could find that the language "to refrain from causing dissension \* \* \* and from unnecessarily interfering with the welfare or duties of each other \* \* \*" signified an intention to cut away from the past conflict and move forward in harmonious cooperation. The jury could find that the parties intended their mutual promises to have substantial effect. Jerome Glazer, for example, wrote the plaintiff a letter at the time of the proposed contract stating he understood it to frame an "effective working arrangement between all of us for the future that lies ahead"; that until the parties were satisfied "we are all each reading the same meanings and intentions that are in these agreements, they represent no more than pieces of paper to any of us"; and that he felt that "a healthy business relationship between us in ordinary terms must be based upon \* \* \* the rights and privileges of each of us as partners. \* \* \*" Contemporaneous with the December 30, 1957, agreement, the parties executed a mutual release on behalf of all the Glazer corporations whose stock was owned entirely by them or together with other members of the family. Just as the December 30 document released the brothers themselves from claims against one another, the release on behalf of the corporations discharged the corporations and the brothers and their successors "from the beginning of the world up to the date of these presents," except for the contemporaneous December 30 agreement. Without resummarizing all the extrinsic evidence, we hold that it was sufficient for a jury to find the agreement a basis for the plaintiff's claims.

B. *Terminability.* The defendant brothers argue that in any event the plaintiff cannot recover because the agreement was merely an employment contract, terminable at the will of the parties. Since the plaintiff seeks damages only for loss of salary and bonus and the contract contains no provision as to duration, they contend, it must be terminable at will. The defendants rest their argument on the cases that hold any employment contract for an indefinite period to be terminable at will. The argument has a basic flaw—it assumes that the jury must find the agreement an employment contract. We hold that a jury could find this agreement was not an ordinary contract for employment. Guilford Glazer did not contract with his immediate employer, Glazer Steel Corporation, which was paying his salary. He contracted with his brother shareholders for continuation of their "present relationship" in enterprise. The plaintiff is not suing Glazer Steel for firing him; rather he is suing his brothers for causing his expulsion from all the companies. The difference is important. The rationale for the "terminable at will" rule is respect for continued personal satisfaction of the employer where he does not hire for a definite term. See 3A Corbin, Contracts § 647 (1960). This clearly was not the relationship agreed upon by the Glazer brothers. None of them was the employer of the other. They were co-shareholders and co-directors and co-officers in a variety of businesses. Under the December 30 agreement, the defendant brothers themselves promised "to make every effort to create a good, healthy, and harmonious relationship." The jury could examine the entire relationship of the brothers at the time of the agreement. It could find that the brothers had chosen Glazer Steel, the strongest and most profitable of their businesses, as the one that would pay salaries and serve as the focal point of their extensive operations. The jury could find that "employment" by Glazer Steel, wholly owned by the brothers, purposely served as the primary funnel for compensation of all the brothers for their entire enterprise. Compensation by the steel company had long been established as a regular pattern by the brothers for various personal and business reasons. The defendants' expulsion of Guilford Glazer from Glazer Steel employment constituted removal from the income distributor regularly established by the brothers. The key issue of the case is whether the parties intended the continuance of that

pattern of compensation by the December 30 agreement. The defendants' conclusory "terminable at will" arguments could not prevent this issue from going to the jury.

■ Moreover, the duration of shareholder agreements has never been an important factor in determining their validity. Professor Hornstein correctly states the rule: "If not expressly stated, the intention of the parties with respect to duration must be construed in the light of the whole agreement and practical construction, if any, prior to any dispute between them. It may be construed effective as to directors or officers so long as they live, provided they remain faithful, etc. On the other hand, it may be adjudged revocable at will." 1 Hornstein, Corporation Law and Practice § 175 at 209–10 (1959). See Storer v. Ripley, 1953, 1 Misc.2d 235, 125 N.Y.S.2d 831, aff'd, 282 App.Div. 950, 125 N.Y.S.2d 339. We hold that the Glazer agreement could properly be construed by a jury to provide for compensation for a reasonable time, possibly until the death or complete retirement of one of the brothers. See Vogel v. Melish, 1964, 31 Ill.2d 620, 203 N.E.2d 411.

C. *Vagueness.* The defendants take the position that paragraph 8 of the agreement is the key to the plaintiff's claim and that it is so vague as to be unenforceable. Paragraph 8 reads as follows:

> The parties agree to and with each other to make every effort to create a good, healthy, and harmonious relationship; to refrain from causing dissension and arguments and from unnecessarily interfering with the welfare or duties of each other and from doing or causing anything to be done

that is contrary to the purposes and intent of this agreement.

■ The defendants regard this paragraph as nothing more than a series of general exhortations to the parties to behave decently toward one another. The plaintiff agrees that ambiguities may exist in some clauses of the agreement, but he asserts that a jury could find the agreement as a whole specific enough to enforce. We hold that the jury could find that the contract, read as a whole, does not because of vagueness fail to support the plaintiff's claim for damages. The same evidence that might clarify ambiguities in the contract's construction could also minimize the pitfalls of vagueness in its enforcement. This suit is not an action for specific performance; we need shape no equitable decree. "[E]ven though an agreement may be too indefinite in its terms to be specifically enforced, it may be certain enough to constitute a valid contract for breach of which damages may be recovered." Gulbenkian v. Gulbenkian, 2 Cir., 1945, 147 F.2d 173, 175, 158 A.L.R. 990. The defendants further assert that this agreement, as an employment contract, must be precise, definite, and certain to be enforced. However, we have already held, in discussing terminability, that this agreement does not purport to describe an ordinary employment relationship. The defendants' analogy to a legally unenforceable family agreement is also untenable. The family cases cited by defendant were all in equity; the leading ones involved continuing supervision of domestic relations.

■ D. *Illegality.* The defendants further assert that the agreement, as construed by the jury, is illegal as a matter of corporate law.[12] The court

---

12. The defendants strongly urge that Guilford's expulsion was justifiable under standard doctrines of corporate law. They observe that the plaintiff's ouster from Glazer Steel conformed to the existing by-laws of the corporation which provided that "the directors shall elect the officers of the corporation and fix their salaries"; and that "the salaries of all officers shall be fixed by the Board of Directors", and that "each of such officers shall serve for the term of one (1) year, or until the next annual election." Jerome testified that he voted not to reelect Guilford as a director on the advice of his attorney "to protect the interests of these corporations." He testified that the businesses were being "torn apart during the negotiations." However, we need not decide the legality

cannot enforce the contract, they say, because not all the shareholders of all the corporations involved were parties to it. At the heart of their argument is language in West v. Camden, 1890, 135 U.S. 507, 10 S.Ct. 838, 34 L.Ed. 254 to the effect that an agreement among shareholders, dividing directorships and corporate offices among themselves, breaches a fiduciary duty to the other shareholders and the corporation, and the agreement is illegal and void. The defendants contend that the presence of outside shareholders in any one of the Glazer corporations voids the agreement as to all the corporations. They assert that the parties intended that the agreement cover all twenty-one Glazer family corporations, and they note that five of these companies had outside shareholders in the period between the signing of the December 1957 agreement and the plaintiff's 1959 ouster.

Shareholder agreements that limit directors' independent responsibility for corporate management have met with variable and inconsistent treatment by the courts.[13] Courts have refused to enforce these agreements on grounds that: (1) the agreement conflicts with corporation acts providing that the directors shall manage the corporation and select its officers;[14] (2) the agreement tends to cause the directors to disregard their fiduciary duties to the corporation and other shareholders;[15] and (3) it is

of the defendants' actions in this case. The plaintiff does not allege that the expulsion was unlawful as a matter of corporate law. He relies only upon his contractual rights. The mere legality of an act, as a matter of public law, need not constitute a defense in a suit for breach of contract. See O'Neal and Derwin, Expulsion of Oppression of Business Associates §§ 3.01, 5.15, & 7.05 (1961). But see 1 O'Neal, Close Corporations § 5.17 at 268 & nn. 58–59 (1958).

13. See 1 O'Neal, Close Corporations §§ 5.16–5.17 (1958). See generally Id. §§ 5.01–5.39; O'Neal & Derwin, Expulsion or Oppression of Business Associates: "Squeeze-Outs" in Small Enterprises (1961); 1 Hornstein, Corporation Law and Practice §§ 171–187 (1959); 3 Oleck, Modern Corporation Law §§ 1384–1396 (1959); 5 Fletcher, Corporations §§ 2064–2067 (Wolf ed. 1952); Anno., 45 A.L.R.2d 799 (1956); Chayes, Madam Wagner and the Close Corporation, 73 Harv.L.Rev. 1532 (1960); Robinson, Shareholder Agreements and the Statutory Norm, 43 Corn.L.Q. 68 (1957); Delaney, The Corporate Director: Can His Hands Be Tied in Advance, 50 Colum. L.Rev. 52 (1950); Hornstein, The Future of Corporate Control, 63 Harv.L. Rev. 476 (1950); Hornstein, Stockholders' Agreements in the Closely Held Corporation, 59 Yale L.J. 1040 (1950); Ballantine, Voting Trusts, Their Abuses and Regulation, 21 Texas L.Rev. 139 (1942); Meck, Employment of Corporate Executives by Majority Stockholders, 47 Yale L.J. 1079 (1938); Note, Freezing Out Minority Shareholders, 74 Harv.L.Rev. 1630 (1961); Note, Removal with Cause of Corporate Executives Under Agreement, 109 U.Pa.Rev. 224 (1960); Note, Validity of Voting Agreements to Continue Shareholders as Directors, 52 Mich. L.Rev. 1243 (1954); Note, Validity of Stockholders' Voting Control Agreement, 47 Mich.L.Rev. 580 (1949).

14. See, e. g., Long Park, Inc. v. Trenton-New Brunswick Theatres Co., 1948, 297 N.Y. 174, 77 N.E.2d 633. See also 1 O'Neal, Close Corporations § 5.16 & n. 44, § 5.17 & n. 58; Note, Delegation of Duties by Corporate Directors, 47 Va.L. Rev. 278 (1961). Some of the more recent statutes provide for greater flexibility in the selection of corporate officers. See, e. g., N.C.Gen.Stats. § 55–34(a) (1960), which provides that the officers of the corporation may be elected by the board of directors or "otherwise chosen"; N.Y.Business Corporation Law, McKinney's Consol.Laws c. 4, § 715(b) (1963): "The certificate of incorporation may provide that all officers or that specified officers shall be elected by the shareholders instead of by the board." See also Fla.Stat.Ann. ch. 63–379 § 3 (1963), F.S.A. § 608.0102 which permits all or any part of the functions of directors to be performed by shareholders. 1 O'Neal, Close Corporations § 5.17 (1964 Supp., at 97–98).

15. See, e. g., West v. Camden, 1890, 135 U.S. 507, 10 S.Ct. 838, 34 L.Ed. 254; Odman v. Oleson, 1946, 319 Mass. 24, 64 N.E.2d 439; Seitz v. Michel, 1921, 148 Minn. 80, 181 N.W. 102, 12 A.L.R. 1060; Van Slyke v. Andrews, 1920, 146 Minn. 316, 178 N.W. 959, 12 A.L.R. 1068; McQuade v. Stoneham, 1934, 263 N.Y. 323, 189 N.E. 234.

**406**

unfair or fraudulent to non-contracting shareholders or might injure them.[16] See 1 O'Neal, Close Corporations §§ 5.16–5.17 (1958). The better-reasoned decisions minimize the first two of these grounds. They go directly to the third question: Does the company have non-contracting shareholders? If so, is the agreement unfair or fraudulent as to them? Would they be injured by its enforcement?[17] The cases often turn on special circumstances. The courts naturally have been more cautious where

a bank, insurance company, or college was the subject of the control agreement.[18] In recent years, courts have shown less reluctance in enforcing shareholder salary-tenure agreements in cases where the number or interest of outside shareholders was small. This is in keeping with modern corporate theory, which emphasizes the realities of management and shareholder interests in each situation.[19]

The unusual character of the Glazer agreement, its special tailoring to the

16. See, e. g., Creed v. Copps, 1930, 103 Vt. 164, 152 A. 369, 71 A.L.R. 1287; Odman v. Oleson, 1946, 319 Mass. 24, 64 N.E. 2d 439, 440.

17. Bausch & Lomb Optical Co. v. Wahlgren, N.D.Ill.1932, 1 F.Supp. 799, aff'd 7 Cir. 1934, 68 F.2d 660, cert. den'd 1934, 292 U.S. 639, 54 S.Ct. 774, 78 L.Ed. 1491, reh. den'd 1934, 292 U.S. 615, 54 S.Ct. 862, 78 L.Ed. 1491; Smith v. San Francisco & N. P. Ry. Co., 1897, 115 Cal. 584, 47 P. 582, 35 L.R.A. 309, 56 Am.St. Rep. 119; Ringling Bros-Barnum & Bailey Combined Shows, Inc. v. Ringling, 29 Del.Ch. 610, 53 A.2d 441 (Sup.Ct. 1947), modifying 29 Del.Ch. 318, 49 A.2d 603 (Ch.1946); Thompson v. J. D. Thompson Carnation Co., 1917, 279 Ill. 54, 116 N.E. 648, Ann.Cas.1917E, 591; Wallace v. Southwestern Sanitarium Co., 1945, 160 Kan. 331, 161 P.2d 129; Brightman v. Bates, 1900, 175 Mass. 105, 55 N.E. 809; Mansfield v. Lang, 1936, 293 Mass. 386, 200 N.E. 110; Hart v. Bell, 1946, 222 Minn. 69, 23 N.W.2d 375, supplemented 222 Minn. 1946, 222 Minn. 69, 24 N.W.2d 41; Trefethen v. Amazeen, 1944, 93 N.H. 110, 36 A.2d 266; Lockley v. Robie, 1950, 301 N.Y. 371, 93 N.E.2d 895, reargument denied 1951, 301 N.Y. 731, 95 N.E.2d 409.

In cases since the turn of the century sometimes cited for the contrary, closer examination suggests that the courts felt an attempt was being made to control the directors, e. g., Creed v. Copps, 1930, 103 Vt. 164, 152 A. 369, 71 A.L.R. 1287. See also 1 Hornstein, Corporation Law and Practice § 176 & n. 64 (1959).

18. West v. Camden, 1890, 135 U.S. 507, 10 S.Ct. 838, 34 L.Ed. 254 (bank); Van Slyke v. Andrews, 1919, 146 Minn. 316, 178 N.W. 959 (bank); Jacobson v. Barnes, 1928, 176 Minn. 4, 222 N.W. 341 (insurance company); Gage v. Fisher, 1895, 5 N.D. 297, 65 N.W. 809, 31 L.R.A. 557 (bank). See also 1 Hornstein, Cor-

poration Law and Practice § 179 & n. 1 (1959).

19. Professor F. Hodge O'Neal, a leading commentator on the close corporation, observes that decisions invalidating restrictive shareholder agreements appear to be based "in part at least on a quite unrealistic idea that directors in making corporate decisions act independently and without regard to the desires of the principal shareholders. Actually * * * directors normally follow the wishes of the shareholders who have elected them, and there appears to be no inherent impropriety in their carrying out the wishes of controlling shareholders as long as minority interests are not unfairly affected. In close corporations in particular, majority shareholders exercise effective control over the decisions of directors." 1 O'Neal, Close Corporations § 5.16 at 264–65 (1958).

Professor O'Neal recommends that "under some circumstances, agreements naming corporate officers and fixing their salaries and tenure should be sustained even though all the shareholders are not parties. The validity of an agreement of this sort should depend on its purpose and effect and on other circumstances. If the agreement serves a legitimate business purpose, if it is calculated to benefit the corporation and the shareholders as a whole * * * the agreement should be sustained, especially if persons not parties to the agreement have not complained about it. On the other hand, if the agreement is unfair to non-contracting shareholders or to creditors or if it has the effect of 'milking' the corporation through exorbitant salaries unrelated to the abilities of the persons holding the offices, it should be invalidated at the suit of a person prejudiced by it; and in the litigation, the burden should be on the person who would enforce the agreement to prove its unfairness." Id., § 5.17 at 273–74.

dispute among the brothers, precludes our identifying it as a member of any special category of corporate contracts. The contract is one among shareholders, but the brothers did not designate the affected corporations in the document. The contract was intended to protect the right to employment, but the agreement does not particularize the positions or salaries involved. The brothers agreed "to continue their present relationship", but avoided their individual responsibilities in the various corporations. These characteristics compel us to test the agreement's enforceability under more general principles of corporation law than those governing the usual variety of shareholder agreements.

■ We look to state law in determining the enforceability of the agreement. That the family companies are incorporated in four states complicates the problem. As in any diversity case, we apply the conflict-of-laws rule of the forum state—here Louisiana. Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed 1477; Palmer v. Chamberlin, 5 Cir. 1951, 191 F.2d 532, 536, 27 A.L.R.2d 416. Louisiana law is silent on which law determines the validity of a shareholders' control agreement involving foreign corporations. But since Louisiana's other conflict-of-laws rules closely resemble those of other states, we can refer to the general law on this issue. Mansfield Hardwood Lumber Co. v. Johnson, 5 Cir. 1959, 268 F.2d 317, 319.

■ The prevailing conflicts rule directs us to the "law of the State of incorporation to determine the extent and nature of relationship between corporation and stockholder, corporate officer or director and stockholder and between stockholders *inter sese.*"[20] The law of the place of the wrong determines the quantum of the breach of duty.[21] Thus Louisiana corporation law, which is peculiarly hostile to shareholder control agreements,[22] does not govern this case. This is not a situation, as in Mansfield Hardwood Lumber Co. v. Johnson, "where the only contact point with the incorporating state is the naked fact of incorporation, and where all the other contact points * * * are found in another jurisdiction." 268 F.2d at 321. None of the Glazer corporations had all its contacts in the forum state. All of them had substantial contacts in their states of incorporation.[23]

■ The defendants contend that if the agreement is unenforceable as to any one Glazer corporation in any one state, it must be held invalid as to all the corporations in all the states. We reject this argument, in favor of a state-by-state determination of the agreement's enforceability as to each one of the Glazer companies. If the agreement were held unenforceable as to Glazer Steel, the base of the corporate pyramid, the whole pyramid might collapse. Glazer Steel generated this case. As it happens, we find the agreement fully enforceable as to the salaries and bonuses payable by Glazer Steel. The contract may be unenforceable as to compensation payable by only one of the corporations, West Virginia Development. That possible defect, one that could turn on a fact undisclosed in the record, will not defeat the enforceability of the agreement as

**20.** Mansfield Hardwood Lumber Co. v. Johnson, 5 Cir. 1959, 268 F.2d 317, 320 & N. 6; Zahn v. Transamerica Corp., 3 Cir. 1947, 162 F.2d 36, 40, 172 A.L.R. 495; Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp., 1951, 89 U.S.App.D.C. 171, 193 F.2d 666, 668. See also Rogers v. Guaranty Trust Co., 1933, 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652.

**21.** Mansfield Hardwood Lumber Co. v. Johnson; Zahn v. Transamerica Corp.

**22.** See, e. g., Williams v. Fredericks, 1937, 187 La. 987, 175 So. 642, 644–645; Lothrop v. Goudeau, 1917, 142 La. 342, 76 So. 794.

**23.** Of the twenty-one Glazer family corporations supposedly covered by the brothers' agreement, seventeen were incorporated in Tennessee; two in Ohio; and one each in Florida and West Virginia. See note 2 supra.

to compensation payable by the other twenty Glazer family companies.[24] This result is consistent with the well-established "divisibility" principle of contract law. "[A] bargain can be lawful, and enforceable, in part, even though the remainder is unlawful and unenforceable". 6A Corbin, Contracts § 1520 at 754 (1962). In this case, we have an adequate "method of determining those 'parts' and the basis of separation." Ibid.

We turn now to an examination of the enforceability of the brothers' agreement under the law of the four states in which the Glazer companies were incorporated:

(1) *Tennessee.* Seventeen of the Glazer family corporations were incorporated in Tennessee.[25] The only recent Tennessee case on the validity of voting agreements in Cummins v. McCoy, 1938, 22 Tenn.App. 681, 125 S.W.2d 509 in which the Court stated, in dictum, that any agreement binding a stockholder to vote contrary to his duty as a stockholder, as provided in the charter and by-laws, is void as a matter of public policy. In that case brothers-in-law Cummins and McCoy jointly purchased the controlling interest in a local Seven-Up bottling corporation. After the purchase, they entered into an agreement providing for equal division of profits, salaries, and other revenues as to themselves, but for general financial management solely by Cummins. The brothers-in-law fell out, and Cummins secretly began buying additional stock in an attempt to gain control for himself. After the dust settled, however, McCoy emerged with the majority of the stock. Thereupon Cummins sued McCoy on the basis of their agreement to enjoin further purchases of stock and to secure for himself a one-half beneficial interest in the additional stock McCoy acquired in the struggle for control. The Tennessee intermediate appellate court, reversing the chancellor, denied relief. The court held the contract void for two reasons: First, it was impossible to enforce the agreement as a joint venture since the court could not force the parties to agree on any controversial matter; and second, the contract was void as against public policy.

■ We find Cummins v. McCoy distinguishable from the Glazer case. The *Cummins* suit was in equity to enforce against a *corporation* and its *minority* shareholders a fixed arrangement for division of revenues and financial management agreed upon by the minority. The Cummins-McCoy contract had less flexibility than the Glazer brothers' agreement. McCoy had promised Cummins, a minority shareholder, that he could dictate on behalf of both of them the amount of salaries, the parties to receive them, dividends to be paid, and all other fiscal affairs of the company. The court held invalid this attempt to invest in a minority shareholder complete authority to control the corporation "without regard to the rights of other stockholders or the provisions of the charter or by-laws." 125 S.W.2d at 513. In the Glazer contract, the brothers did not delegate sole authority over salaries and dividends to a minority interest. They agreed that "the parties shall receive such salaries, bonuses, and dividends as the Board of Directors of the corporations shall authorize and declare." (Paragraph 6.) The brothers did not vest sole authority with Guilford Glazer to manage the corporations; the purpose of the agreement was to preserve continued, joint management of the corporation by all three brothers. That four of the Tennessee Glazer corporations had several minority shareholders does not void the brothers' contract. All the minority shareholders of two of these cor-

---

24. The record does not disclose whether the outside shareholders in West Virginia Development gave their consent to the Glazer agreement. This could be critical to enforceability under West Virginia law. The parties may not even have intended their agreement to cover West Virginia Development. We have assumed that West Virginia Development was covered only to give full consideration to the defendants' illegality arguments.

25. See note 2 supra.

porations [26] signed, in the capacity of director or officer, the related contemporary mutual release.[27] The other two corporations,[28] neither of which had ever paid any salaries to the plaintiff, had a single minority shareholder, the plaintiff's oldest brother Morris, who did not object to or claim prejudice from the brothers' agreement.

The Cummins opinion, to be sure, does contain some general language that casts doubt on the validity of all shareholder voting agreements. See 1 O'Neal, Close Corporations § 5.04, at 231 & n. 22 (1958); Annot., 45 A.L.R.2d 799, 823 (1956). However, the Tennessee court was purportedly following Massachusetts and Minnesota cases, neither of which actually holds that all shareholder agreements are void. In Guernsey v. Cook, 1876, 120 Mass. 501, the court recognized that there is nothing inherently invalid in a shareholder's voting contract assented to by all the other holders of stock in the corporation. In that case, there was no evidence that other shareholders knew or consented to an agreement for compensation and tenure as an officer, or that one party did not intend to give the other a private advantage. In Van Slyke v. Andrews, 1920, 146 Minn. 316, 178 N.W. 959, the court held invalid the agreement by directors of a national bank to elect one of their number chairman of the board on the theory that directors of a bank occupy a fiduciary relation to the bank and its stockholders which prohibits them from binding the bank in their official capacity for the personal benefit of anyone.[29]

The pre-Erie Supreme Court case, West v. Camden, 1890, 135 U.S. 507, 10 S.Ct. 838, 34 L.Ed. 254, relied on by the defendants, may be distinguished in the same way as *Cummins*. Although West v. Camden has occasionally been

---

**26.** Colonial Village Corporation and Shelbourne Towers, Inc. See note 2 supra.

**27.** See note 5 supra. The mutual release contains language signifying consent of the parties to the brothers' December 30 agreement. The preamble of the release expressly states the desire of the parties "to carry out the intents and purposes" of the December 30 agreement. Moreover, the parties by this document released all their mutual claims in order that the agreement among the brothers might succeed. The release as a whole could be construed as a general approval by the parties of the obligations and duties imposed by the December 30 agreement among the litigants.

All the Glazer family corporations except four were parties to this mutual release. Three of these four non-parties— Park Management Corporation, Builders Investments, Inc., and Roach Insurance Agency, Inc.—were wholly-owned by the litigants. See note supra. The remaining non-party, West Virginia Development Corporation, did have outside shareholders. This company is dealt with as a West Virginia corporation later in the opinion.

Among the twenty-two corporations that were parties to this release, only four had shareholders other than the litigants. *Every outside shareholder* of two of these companies, Colonial Village Corporation and Shelbourne Towers, Inc.,

signed the release as a director or officer of the company. In these circumstances, the additional consent of each outside shareholder in his express capacity as shareholder was unnecessary.

Of the other two corporations with outside ownership that were party to the release, Trustee Corporation and Magnolia Apartments, Inc., *every shareholder but one* signed the release as a director or officer. The one non-signer was Morris Glazer, the older brother of the litigants. This brother held eight per cent of the shares of Trustee and twenty-five per cent of the shares of Magnolia. R. 111, 1317–1318.

**28.** Trustee Corporation and Magnolia Apartments, Inc. See note 2 supra.

**29.** The Minnesota Supreme Court in Seitz v. Michel, 1921, 148 Minn. 80, 181 N.W. 102 refused to enforce a shareholder agreement largely because there were numerous other shareholders and "they had the right to have defendant exercise his independent judgment in casting his vote." 181 N.W. at 104. The court declined to express an opinion "as to whether every combination of 'gentlemen's' agreement among the principal stockholders should be held to be unenforceable if the parties choose to repudiate it." It limited its decision "strictly to the facts as they appear from the complaint" in this case. Ibid.

cited for broad condemnation of voting agreements,[30] that case has a narrow holding: A contract between directors of a corporation (Maryland in that case) to keep one of them in office irrespective of changed circumstances is unenforceable where the promisor is the trustee for the majority shareholder and the promisee has only a small minority interest. Its rationale is simple and specialized: As "to the directors of a private corporation, charged with duties of a fiduciary character to private parties, * * * it is public policy to secure fidelity in the discharge of * * * [their] duties." 135 U.S. at 521, 10 S.Ct. at 841, 34 L.Ed. at 258. In this case, we cannot say that the parties had a significant fiduciary obligation to private persons that would be violated by their agreement.

We hold that Tennessee's interest in protecting minority shareholders of the Tennessee corporations, as stated in Cummins v. McCoy, supra, is satisfied in this action for damages by the flexibility of the agreement; the virtual consent of all but one of the Tennessee corporation shareholders; and the lack of prejudice to or objection by the one remaining family member with a minority interest. In the circumstances here, Guilford Glazer has an enforceable right to damages for his offices and salaries in all the Tennessee corporations.

■ (2) *West Virginia.* One of the Glazer family corporations, West Virginia Development Corporation, was incorporated in West Virginia. The briefs contain no discussion of West Virginia cases on this issue, even though West Virginia Development had the largest minority interest of any Glazer corporations—the forty per cent owned by Hugh and Alfred Sanford, who were unrelated to the Glazer brothers. Our search of the authorities indicates that West Virginia probably would follow the Massachusetts rule in not enforcing agreements in which directors, acting for themselves without the consent of all the shareholders, bargain away their discre-

tion by promising to vote in a specific manner. See Bias v. Atkinson, 1909, 64 W.Va. 486, 63 S.E. 395; 6A Corbin, Contracts § 1454 & n. 57 (1962). Following Guernsey v. Cook, 1876, 120 Mass. 501, as did the Tennessee court in Cummins v. McCoy, the West Virginia Supreme Court of Appeals has stated, in a case involving the sale of a majority interest of a corporation without the consent of the minority: "No stockholder or set of stockholders should be permitted by contract in advance to bind themselves to vote in any particular way on any proposition touching the interests of the corporation they represent, unless with the *knowledge and consent* of all the stockholders." Bias v. Atkinson, 63 S.E. at 397. (Emphasis added.) This "knowledge and consent" standard gives ample protection to the non-family shareholders of West Virginia Development. We find no evidence that the Sanford brothers expressly consented to the Glazer agreement. But there is some indication that they knew of the contract and did not disapprove of it. In these circumstances, we hold that the agreement is unenforceable as to compensation payable directly or indirectly to the plaintiff by West Virginia Development Corporation. If the plaintiff wishes to seek compensation from this company, he will have to prove that the Sanford brothers did consent to the agreement.

■ We hold that the Sanford brothers' forty per cent outside participation in West Virginia Development does not void the agreement as to all the other Glazer corporations. "Enforcement in part will never be granted if such enforcement enables a party to attain his illegal purpose, even in part." 6A Corbin, Contracts § 1520 at 757 (1962). But if as in this case "such attainment is wholly avoided, if the degree of illegality is not great, and if enforcement in part is not unfair and unreasonable, the court may be justified in declaring that the transaction is divisible and in enforcing the lawful part." Ibid. Cf. Pennington v. United Mine Workers, 6

39. See O'Neal, Close Corporations, § 5.16 and nn. 37–39, 45.

Cir. 1963, 325 F.2d 804, rev'd on other grounds, 1965, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626.

(3) *Ohio.* The two Glazer corporations incorporated in Ohio, General Development Corporation and the Swifton Corporation, had no shareholders other than the Glazer brothers. Ohio follows the Massachusetts rule of Guernsey v. Cook, 1876, 120 Mass. 501. Under Ohio law, an agreement made and assented to by all the stockholders and not prejudicial to the rights of the minority interests is not void as a matter of public policy. See Thomas v. Matthews, 1916, 94 Ohio St. 32, 113 N.E. 669, L.R.A.1917A, 1068; Suesskind v. Wilson, 1931, 124 Ohio St. 54, 176 N.E. 889; Seagrave Corp. v. Mount, 6 Cir. 1954, 212 F.2d 389, 396; 6A Corbin, Contracts § 1454 & nn. 53–54 (1962). Since the Glazer brothers owed a fiduciary duty to no Swifton shareholders but themselves, we hold the agreement enforceable as to the plaintiff's office and other rights in that corporation.

(4) *Florida.* The one Glazer enterprise incorporated in Florida, Mayfair Village Corporation, also had as its sole shareholders the Glazer brothers. We hold that the contract is enforceable under Florida law for damages as to the plaintiff's rights to his office in Mayfair. The contract does not violate any express statutory provisions or contemplate oppression against minority shareholders of a Florida corporation. See Stone v. Holly Hill Fruit Products, 5 Cir. 1932, 56 F.2d 553; Fla.Jur. § 196 (1956).

The short of the enforceability issue is this: Although the validity of the agreement may be doubtful under West Virginia law, it clearly may be enforced as to the plaintiff's compensation from those corporations whose states would approve this agreement. The validity of the contract is severable as to the various family corporations. We conclude that the agreement is enforceable as to the plaintiff's compensation deriving from all the Glazer family corporations, except West Virginia Development. On remand, the plaintiff will have the opportunity

to prove that the outside shareholders of the West Virginia corporation did consent to the agreement. If he succeeds in doing that, the agreement would also be enforceable as to compensation deriving from West Virginia Development.

E. *Conspiracy.* Jerome and Louis contend that Guilford proceeded under an illegal theory, conspiracy to breach a contract, and failed to pursue his remedy for breach of contract. They argue that an injured party to a contract cannot recover in tort from another party on the ground the latter conspired with others to breach the contract. The plaintiff asserts that his complaint sounded both in tort and contract, but that he clearly withdrew the tort cause in open court before the defendants presented their case.

The complaint does charge both "conspiracy *and* the resulting breach of said agreement". (Emphasis added.) Although the plaintiff orally withdrew his claim for other than compensatory damages, and expressly asked the court to "forget the conspiracy", he never deleted the conspiracy allegations from his complaint. Consequently, the court in its charge referred to the allegations of conspiracy as well as to the breach of contract.

The plaintiff's failure to amend his pleadings to conform to his changed theory of the case was confusing, but it was not fatal. At the outset of the charge that the trial judge instructed the jury that the action is a suit for the alleged breach of contract. Again at the conclusion of the charge the trial judge said that if the jury found the defendants' actions "did not constitute a breach of the December 30, 1957, contract, then the verdict would be for the defendants." Whether for breach or conspiracy to breach, the major issues of the case were the same—construction of the agreement; failure of consideration; breach by the plaintiff; and abandonment. To find a conspiracy the jury would have had to find an agreement between the defendants to breach the contract in addition to evidence that their individual conduct itself constituted a

breach. Although it would have been more orderly for the plaintiff to have amended his pleadings to conform to the development of his case, we cannot say the jury did not properly have before it the issue of the defendants' breach of contract. The only substantial prejudice that might have resulted from the court's inclusion of conspiracy language in the charge would have been excessive damages. For this and other reasons to be stated presently, we are remanding the case for re-determination of the damages.

The defendants' contention that the claim is barred by Louisiana's one-year tort statute of limitations drops out in view of the plaintiff's ultimate reliance solely on the contract theory. Similarly, the court did not prejudice the defendants in instructing the jury to ignore events prior to December 30, 1957, in determining their liability; this evidence would have relevance mainly to the defenses of independent action or justification for conspiracy. Since the conspiracy theory died early in the case, the court properly limited consideration of this evidence to matters involving construction of the contract.

## IV.

### New Trial

The trial court conditionally denied a new trial in accordance with the new Rule 50(c), F.R.Civ.P. We are satisfied that the jury's adjudication of the defendants' liability is supported by the substantial weight of the evidence and that the court did not commit errors so prejudicial as to require a complete new trial.

■ A. The defendants contend that the court erroneously left to the jury the question whether the agreement was ambiguous. It is true, of course, that the initial determination of whether a contract, or any part of it, is ambiguous is a question of law for the court. See St. Paul Mercury Ins. Co. v. Price, 5 Cir. 1964, 329 F.2d 687. Yet the court in this case instructed the jury that it should itself determine whether the contract was ambiguous. The court did not specifically state whether it found the contract ambiguous as a preliminary matter. We find the court's failure to state an express view, however, to be implied recognition of the agreement's ambiguity. The court in effect gave the jury an opportunity to second-guess. This was, if anything, more favorable to the defendants than if the court had ordered the jury to find the contract ambiguous. But the defendants argue that the court first should have learned whether the jury found the contract ambiguous; and if the jury found the contract clear and unambiguous, the court should have carefully instructed it further in the details of its interpretation. We do not agree. The court carefully spelled out the method the jury should follow in construing the agreement. It explained the alternative methods for finding a contract wholly ambiguous, wholly clear, or only partly clear. The principal issue of the case was construction of the agreement. Both the counsel and the court repeatedly explained the problems of construction to the jury. We have already said that a jury could find this contract ambiguous in whole or in part. We conclude that the court did not commit prejudicial error in giving the contract to the jury for determination of this issue.

■ B. The defendants assert that the verdict for the plaintiff was against the clear weight of the evidence. They contend that the evidence does not support findings that (1) the parties intended the agreement to assure one another tenure in office; or (2) the parties did not abandon the contract prior to the alleged breach in October 1959. We have previously discussed the evidence on the tenure issue, and we conclude that the jury could find, on the clear weight of the evidence, that the parties intended the agreement to assure their tenure in the future management of the family enterprise. In support of their abandonment argument, the defendants rely on negotiations among the parties between the 1957 agreement and the 1959 breach. The jury did not accept this argument. We find that the clear weight of evidence supports the parties' continued reliance on the 1957 agreement, even while negoti-

ating new arrangements for separation or fixed compensation, right up until the 1959 breach. Whether the clear weight of the evidence supported a conspiracy is unimportant since a finding of conspiracy was unnecessary to the conclusion of a breach and a verdict for the plaintiff. The conspiracy element of the charge, as we have said, was an unfortunate but remediable defect.

We conclude that the verdict was supported by the clear weight of the evidence, except for the award of damages, which we now proceed to consider.

### V.

#### Damages

■ The defendants contend that the $1,900,000 verdict was excessive and unsupported by the weight of the evidence. We agree and remand for remittitur or, at the option of the plaintiff, a new trial on the issue of damages. This court has held that "an abuse of discretion is an exception to the rule that the granting or refusing of a new trial is not assignable as error." Whiteman v. Pitrie, 5 Cir. 1955, 220 F.2d 914, 919; Silverman v. Travelers Insurance Co., 5 Cir. 1960, 277 F.2d 257.

Here that abuse of discretion is present in the court's failure to grant the defendants' motion for a new trial or for a remittitur. The verdict was excessive as a matter of law in that it exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before the jury.

We cannot be sure of the rationale for the jury's award of $1,900,000. The record suggests, however, that the jury simply took as the measure for lost salary and bonus the same amount—$1.9 million—as the defendants offered the plaintiff for his entire investment in the Glazer family corporations in negotiations prior to the breach. Although the $1.9 million figure appears only once in the evidence, the plaintiff's attorney repeatedly emphasized this amount in his argument to the jury, particularly in closing. However, the record does not show that the investment was worth $1.9

million or that the breach necessarily would have the effect of forever denying Guilford Glazer the value of his investment in the family enterprise. As the complaint states, this was an action for salary and bonuses. The prayer of the complaint was limited to $600,000 compensatory damages, aside from the plaintiff's abortive attempt to invoke the Tennessee treble damages statute. On this record, there is no basis for the jury to award the plaintiff the value of his investment as compensation for lost salary and bonuses. The $1.9 million in a lump sum judgment exceeds even the largest salary projections devised by the plaintiff aided by the luxury of hindsight. We must set it aside as unsupported by the theory of the action or by the evidence.

The confusion surrounding the conspiracy allegation throughout the trial represents an independent reason for reversing the denial of a remittitur or new trial for damages. The court's resurrection of the conspiracy theory in the charge, over the plaintiff's objection, may well have prejudiced the defendants in the matter of damages, although as we have said, it did not affect their liability for breach of the contract.

■ We agree with the defendants' contention that the plaintiff did have a duty to mitigate his damages after the breach. We have said that the agreement does not have the characteristics of an ordinary employment contract in its terminability or enforceability because Guilford Glazer did not hold his positions on the condition of satisfying his brothers. However, the employment contract analogy is suitable for the determination of lost salary and bonuses. The defendants concede that the burden is on them to show in mitigation of damages what income, if any, Guilford Glazer received as a result of relief from performance of the contract. The defendants introduced, and the court properly admitted, extensive testimony of post-breach, income-producing activities in which the plaintiff could not have engaged while continuing to fulfill his

**414**

obligations to his brothers and the family corporations under the agreement. See News Publishing Co. v. Burger, 1911, 2 Tenn.C.C.A. 179; Congregation of Children of Israel v. Peres, 1866, 42 Tenn. 620.

 The defendants protest the trial court's refusal to allow their discovery of the plaintiff's income tax returns and personal net worth and financial statements for the purpose of proving mitigation. The whole question of discovery for "good cause" rests within the sound discretion of the trial court. See Fulenwider v. Wheeler, 5 Cir. 1958, 262 F.2d 97, 99. We find no abuse of that discretion in this case, but the trial judge on remand may wish to re-examine this decision in the course of further proceedings on the damages issue.

To summarize: We do not reverse the denial of a new trial or remittitur merely because we think the verdict is excessive in fact. In the circumstances of this case, we think it clear that there were errors of law which can be corrected, following our reversal of the judgment n.o.v., only by remand of the cause for remittitur or retrial on the issue of damages. Reversed and remanded.